No. 88-26

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

STATE OF MONTANA,

        Plaintiff and Respondent,

   -vs-

MARK MISNER,

        Defendant and Appellant.

APPEAL FROM: District Court of the Fourteenth Judicial District,
In and for the County of Musselshell,
The Honorable Roy Rodeghiero, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Michael M. Morse, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Robert F.W. Smith, Asst. Atty. General, Helena
        Peter W. LaPanne, County Attorney, Roundup, Montana

Submitted on Briefs: Aug. 4, 1988

Decided: October 6, 1988

FILED
'88 OCT 6 AM 10 27
CLERK
MONTANA SUPREME COURT

Filed '88 OCT 6 1988

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Mr. Misner appeals his conviction of felony assault and disorderly conduct in a jury trial in the District Court for the Fourteenth Judicial District, Musselshell County. We affirm.

The issues are:

1. Was there sufficient evidence to convict Mr. Misner of felony assault on Mr. Taber?

2. Can Mr. Misner's actions properly give rise to verdicts of felony assault and disorderly conduct?

At approximately 4:30 p.m. on March 31, 1987, Mr. Misner and his wife went to the Musselshell County Welfare Office in Roundup, Montana. Mrs. Taber, a secretary in the office, and her husband, the eligibility technician, both testified at trial that Mr. Misner had become angry and shouted on previous visits to the office. For example, Mr. Taber testified that:

> The earliest meeting in January did result in an argument. I again had tried to explain the criteria that we use to determine eligibility, the types of things that an applicant must present for verification or proof, if you will, of their circumstances.
>
> Q. How was there an argument; how did an argument develop?
>
> A. Things that are required of an individual when applying for programs, things like birth certificates, marriage licenses, things of that nature, Mr. Misner said he didn't have and couldn't get, and what was he supposed to do if he couldn't get them? And he would get angry because I wasn't, you know, handing him money right then and there on the spot. And I don't control those things. That's policy, you know. And he left the office that day. He wanted my supervisor's name; he wanted to talk to somebody else. I can assume he did not approve

2

or like what I was saying, and perhaps didn't believe what I was telling him; I don't know. I can only assume. I did give him the number to Lewistown. And as he left my office that day he was again volatile and angry, and you know, we had already had arguments in the past. I gave him the number, and as he walked out of the office he leaned up against the door and he said, "Well, I don't know," he says, "I'm going to call Lewistown," but he says, "I'm going to get some help if I have to bust some heads around here." There isn't but one tech in this County, and that's my head.

When he came into the welfare office on March 31, Mr. Misner complained to Mrs. Taber about being required to fill out certain forms as part of the process of applying for welfare benefits. She testified that:

Well, after a time, you know, I couldn't calm him down any more, and he just kept yelling. So at this point Dan came out of his office, and he asked what the problem was. And Mark then continued to say the same things to Dan, yell and swear, and told him he was sick of everything, filling out papers. And Dan said, "Well, you don't have to fill out the papers if you don't want to." He said, "I'm just doing my job." And he said, "Frankly, I don't need this abuse from you; every time you come in you are like this." So at that point Mark turned around and he stormed out the door and he stopped in the middle of the street and he lifted up his fist like this (indicating) and he said -- I understood it to mean he was yelling at Dan -- he said, "Come out here and we'll settle this right now." And I just kept standing there watching him. And so at this point Dan had turned around and gone back into his office, so he didn't see him do this. So I watched him walk across the street --

Mr. Taber testified as to what happened after he spoke to Mr. Misner:

I just kind of shook my head. I was pretty rattled. I've been through this same scenario with

3

Mr. Misner many times. It keeps getting worse each time. Every contact he is displeased with what I have to say or what action has been taken. And I just kind of shook my head as he was going out the door, and he hollered back, "Why don't you come out here and we'll settle this right here and now." And I took that to mean he wanted to fight me out in the street.

Q. Did you?

A. Is that going to settle anything? No. I didn't.

Q. Did you respond at all to his invitation?

A. No. I didn't make any comments. I just walked back in my office, you know. . . .

Mrs. Taber testified as to what happened next:

[W]hen he got to his pickup he opened the door all the way open, and with his left hand he flipped the seat forward, reached in with his right and just picked [a rifle] up like this (indicating). I couldn't tell if he had his finger on the trigger or not, but he just picked it up with one hand like this (indicating) and was yelling and shaking it. And at that point I said, "Oh, my God, he's got a gun." And I just stood there. I just stood there.

Mr. Taber testified as follows:

About that time I was standing in the office, my door was open, Kathy yelled "Oh, my God, he's got a gun." I looked out there; I could see her desk -- her desk is in full view of mine. She was standing there kind of bolt upright, in a daze, and I didn't know what to do. I mean frankly I don't know how long I stood there. When she said, "Oh, my God, he's got a gun," I knew in my heart he had a gun.

Q. How did that make you feel?

A. I was scared. I hunt a lot. I know what guns can do. And I watch TV too. I'm scared. You know, I'm not in this job to get shot. And frankly I've been scared for a long time, because I don't

4

know when this guy is going to go off the deep end and do something. I've had too many arguments, every time he comes in the office. And now he's got a gun. I stood there in shock for a few seconds; I don't know how long. I walked out there, and at that time I saw just enough to see him closing the door, and he drove off.

Mr. Misner was charged with two counts of felony assault. At trial, he presented the testimony of his wife and a third party that he had not waved a gun, but that he had banged a shovel against his truck before he got into it. The jury found him guilty of felony assault upon Mr. Taber and guilty of disorderly conduct, a lesser included offense, in relation to Mrs. Taber. Mr. Misner was sentenced to seven years in prison with the sentence suspended on seven conditions including 90 days in the county jail and staying away from the victims. He appeals.

I

Was there sufficient evidence to convict Mr. Misner of felony assault on Mr. Taber?

"A conviction cannot be overturned when the evidence, viewed in the light most favorable to the prosecution would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." State v. George (1983), 203 Mont. 124, 130, 660 P.2d 97, 100, citing Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. Our review is therefore limited to a determination of whether any rational jury could have found the elements of felony assault.

A person commits the offense of felony assault if he purposely or knowingly causes reasonable apprehension of serious bodily injury in another by use of a weapon. Section 45-5-202(2)(b), MCA. The defense appears to be addressing its arguments to the element of reasonable apprehension of

serious bodily injury. It refers to the absence of any evidence that Mr. Misner pointed the rifle at Mr. Taber or even at the welfare office. It also refers to the absence of any claim that Mr. Taber saw the rifle. Further, it emphasizes the physical distance between Mr. Misner and Mr. Taber at the time Mr. Misner waved the rifle.

The essence of the defense's argument is that Mr. Taber neither saw nor came into close enough physical proximity to the gun. The defense would appear to ask us to require that Mr. Taber must step outside the welfare office and into the street in order for an apprehension of serious bodily injury to be reasonable. However, Mr. Taber did testify about his previous confrontations with Mr. Misner and that he was told by his wife that Mr. Misner, who had just left the office, had a gun outside the building. He unequivocally testified to his apprehension of serious bodily injury. We conclude that it was not necessary that Mr. Taber personally observe the gun being waved at him in order to experience reasonable apprehension of serious bodily injury.

We hold that the jury in this case, as a rational trier of fact, could have found the presence of the essential elements of felony assault upon Mr. Taber, beyond a reasonable doubt. We therefore affirm the conviction on that charge.

II

Can Mr. Misner's actions properly give rise to verdicts of felony assault and disorderly conduct?

The defense asserts that one act on the part of Mr. Misner cannot give rise to the two divergent verdicts reached here. It does not develop this argument any further and the State points out that no objection was made to the instructions given at trial. We may assume that the question raised

6

is how the acts could constitute felony assault as to Mr. Taber and only disorderly conduct as to Mrs. Taber.

We conclude, based on Mrs. Taber's testimony, that a rational jury could have found that she did not have reasonable apprehension of serious bodily injury because she did not believe Mr. Misner's threats were aimed at her. Also based on that testimony, a rational jury could have found that Mr. Taber had reasonable apprehension of serious bodily injury because he reasonably believed Mr. Misner's threats from the street were aimed at him. Since we conclude that the evidence would allow the above findings by a rational jury, we affirm the convictions.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

7

Mr. Chief Justice J. A. Turnage, dissenting:

I agree with Mark Misner that there was insufficient evidence to convict him of felony assault upon Dan Taber under § 45-5-202(2)(b), MCA. This section provides:

> (2) A person commits the offense of felony assault if he purposely or knowingly causes:
>
> . . .
>
> (b) reasonable apprehension of serious bodily injury in another by use of a weapon.

Dan Taber and his wife Kathy Taber on March 31, 1987, were employed at the Musselshell County Welfare office at Roundup, Montana.

Misner was at this office seeking assistance and was verbally abusive to Kathy over filling out certain forms. Dan Taber came out of his office, separate from what was apparently the reception area, and told Misner he did not have to fill out the forms if he chose not to do so. Misner left, Dan Taber returned to his office and did not see any more of the conduct of Misner that resulted in his conviction of felony assault; but Kathy did, and therein lies the problem.

Kathy testified that, out of the sight of Dan Taber, Misner stood in the middle of the street outside the welfare building and yelled, "come out here and we'll settle this right now." Dan Taber heard this.

Kathy further testified that Misner then crossed the street to his truck, about thirty yards from the welfare building, took a .22 caliber rifle from it, and with one hand, the barrel point in the air, shook it in the direction of the welfare building. Misner never aimed or pointed the

rifle at Kathy, Dan or the welfare building. Dan Taber never saw Misner with the rifle. Misner then drove away.

Kathy Taber yelled, "oh, my God, he's got a gun." At that time Dan Taber came out of his office, after Misner had driven away.

The jury found Misner not guilty of felony assault upon Kathy Taber and guilty only of disorderly conduct, a misdemeanor, as to his conduct towards her. It is logically inconsistent that the jury would find Misner not guilty of felony assault upon Kathy Taber, who was the only one to testify as an eyewitness to Misner's conduct with the rifle. If any one, under these facts, could have had a reasonable apprehension of serious bodily injury, it would have been Kathy Taber, not Dan Taber.

The only testimony that the jury heard concerning a felony assault upon Dan Taber was the statement of Kathy that Misner had a gun. Dan Taber did not see the gun or that it was aimed at him, which it never was. The only reference to the gun was the statement by Kathy Taber that Misner had a gun.

The record is insufficient as to evidence that Misner purposely or or knowingly caused reasonable apprehension in Dan Taber of serious bodily injury by use of a weapon.

This evidence, when viewed in the light most favorable to the prosecution, would not allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.

The determined and successful effort of the county attorney over objection to get before the jury testimony that Misner had received considerable assistance and money from the welfare office did little to encourage the jury to avoid bias toward Misner.

9

Undoubtedly, Misner was less than a good witness in his own defense, leaving the jury with little reason to search their minds for compassion, but the result in this case is not how our justice system determines the basis of guilt or innocence of an accused.

I would reverse Mark Misner's conviction of felony assault.

_____
Chief Justice

We concur in the foregoing dissent:

_____

_____
Justices