No. 03-314

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 275

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

DUSTIN STEELE,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. ADC 2002-167(b)
The Honorable Julie Macek, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Carl B. Jensen, Jr., Attorney at Law, Public Defender Office,
          Great Falls, Montana

      For Respondent:

          Honorable Mike McGrath, Montana Attorney General, Robert Stutz,
          Assistant Attorney General, Helena, Montana; Brant Light, Cascade County
          Attorney, Susan Weber, Chief Deputy County Attorney, Joel Thompson,
          Deputy County Attorney, Great Falls, Montana

                  Submitted on Briefs:  June 8, 2004

                         Decided:  October 5, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Dustin Jay Steele (Steele) appeals the judgment of the Eighth Judicial District Court, Cascade County, denying his motion for a mistrial.

¶2      We address the following issues on appeal and affirm:

¶3      1.      Did the District Court err in denying Steele's motion for a mistrial?

¶4      2.      Did the District Court have sufficient evidence before it to support Steele's conviction of assault on a peace officer?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      The facts are undisputed.  The Great Falls Police Department received information that Steele was in possession of drugs and firearms.

¶6      Based on this information, the police obtained a search warrant.  However, due to the information that Steele was always armed, the police attempted to get Steele outside his residence in order to conduct the search peacefully.  Thus, an officer who had an established rapport with Steele contacted Steele, asking Steele if he would meet the officer at a local restaurant.

¶7      After Steele agreed to the meeting, several officers, including Officer Baumann, witnessed Steele flee from his residence.  They noticed that Steele was running with his hands in his pants, attempting to keep items from falling out of his pants.  Steele's actions were indicative to the police that Steele was armed.  Officer Baumann pursued Steele, and upon coming within several feet of him, Steele slowed and pivoted toward him while at the same time reaching into his waistband.

¶8      At that point, Officer Baumann testified that he believed Steele was acquiring him as

2

a target and that he feared for his safety and his life. A gunshot then rang out and Officer Baumann saw Steele drop a pistol. The officers later discovered that Steele had shot himself in the calf.

¶9 Officer Baumann tackled Steele to the ground, after which a second gun fell to the ground. Thereafter, the officers found several other items in Steele's possession, including a knife and a pipe used for inhaling drugs.

¶10 Upon their search of Steele's home, the officers found three surveillance cameras, a police scanner, two baggies of methamphetamine, aluminum foil with burn marks and residue, marijuana, and several other weapons.

¶11 Steele was charged with eight separate offenses, including a felony assault on a peace officer charge. Of the eight counts, Steele conceded at trial that he was guilty of seven of them. Regarding the remaining contested felony assault on a peace officer charge, the jury received testimony, and the case was submitted to them for deliberation.

¶12 During deliberations, the jury became deadlocked. The foreperson advised the bailiff of their situation, after which time the bailiff testified to what followed.

> Best of my knowledge it was approximately between 8:15 and 8:30. There was a knock on the door, answered the door, the foreperson said, we are split, basically, we are hung.
>
> I said you need to keep working on it. I went inside. She [the foreperson] tried to show me where they split. I pushed the paper away. I didn't want to see anything like that. I said the Court has instructed me, or has made mention, that we will be here until at least midnight.
>
> I said you need to find a common ground and keep working on it. As, has been my experience in the past, most judges, you know, are--you will keep

3

deliberating on such matters. I have done this in the past and I have never had a problem with it.

¶13 The bailiff advised the jury in the above-quoted fashion outside the presence of the parties and without the judge's approval. Upon learning of this occurrence, Steele moved for a mistrial. In denying his motion, the judge stated:

> In looking at that [whether Steele's rights were prejudiced by the bailiff's actions], although the actions of the bailiff are not what the Court would have preferred would have occurred here, they were exactly what I was going to instruct the jury within moments of the time that I was advised that there was a motion that was to be made.
>
> And it was the Court's full intent to advise this jury that they were to go back and they were to continue to deliberate. They were to do that in every effort to reach a verdict in this matter.
>
> . . .
>
> So the Court, after reviewing everything in front of it, and in light of the fact that the Court would have instructed this jury exactly what the bailiff did, although I, again, am not condoning what has occurred here, what I have to look at is whether or not the defendant's been prejudiced as a result of it.
>
> In light of my full intent to give this jury the instruction that they had to continue to deliberate, the Court cannot find that the defendant has been substantially prejudiced in light of this.

¶14 Steele now appeals the District Court's denial of his motion for a mistrial.

4

¶15     We review a district court's grant or denial of a motion for a mistrial to determine whether the district court abused its discretion.  *State v. Kennedy*, 2004 MT 53, ¶ 14, 320 Mont. 161, ¶ 14, 85 P.3d 1279, ¶ 14.

## DISCUSSION

¶16     **1.      Did the District Court err in denying Steele's motion for a mistrial?**

¶17     Steele argues that "the bailiff should not have responded to the jury," as "[i]t is the province of the [District] Court--not the bailiff--to answer the jury's concerns."  By doing so, Steele argues that "the bailiff denied the parties and the parties' counsel the opportunity to consult with the [District] Court, which is a right the parties have under" § 46-16-503(2), MCA.  In addition, Steele argues that the bailiff's response to the jury, namely that the jury needed "to find a common ground," violated Montana law, since "[i]n Montana, jurors are not required to find common ground."  Steele contends that the bailiff's directive constituted "an impermissible 'Allen' charge."  Hence, on that basis, Steele argues that his convictions should have been vacated.

¶18     The State of Montana (the State) responds first that in arguing that his convictions should have been vacated, "Steele does not distinguish between those counts his counsel conceded at trial that he committed, and the single count he contested at trial."  As such, "[s]ince the jury's verdict on the uncontested counts would have been unaffected by the bailiff's conduct, denying a mistrial on those counts would not have denied him a fair and

impartial trial." Therefore, the State argues, "the district court's denial of Steele's motion was appropriate regarding the uncontested counts."

¶19 Regarding the bailiff's statements to the jury, the State contends that § 46-16-503(2), MCA, is "inapplicable to this case," as "[t]here is no suggestion that the jurors disagreed about the testimony or desired instruction on a point of law, the two situations that trigger the applicability of the statute." Further, the State argues that "nothing in this case 'could be construed as coercing a minority juror into following the majority,'" given that "the bailiff . . . did not know if there was a majority view or how the jurors were split, having refused their attempts to provide the split." Rather, the State contends that the substance of the bailiff's statements "is consistent with the district court's advice to its juries," and is similar to the statement at issue in *State v. George* (1986), 219 Mont. 377, 711 P.2d 1379. The State also argues that, unlike the situation in *State v. Randall* (1960), 137 Mont. 534, 353 P.2d 1054, "members of Steele's jury were not told to give 'proper regard and deference to the opinions of each other.'"

¶20 We address Steele's arguments separately.

**Bailiff's Actions**

¶21 Section 46-16-503(2), MCA, states:

> After the jury has retired for deliberation, if there is any disagreement among the jurors as to the testimony or if the jurors desire to be informed on any point of law arising in the cause, they shall notify the officer appointed to keep them together, who shall then notify the court. The information requested may be given, in the discretion of the court, after consultation with the parties.

6

¶22 In *State v. Herron* (1976), 169 Mont. 193, 545 P.2d 678, we held that the communications between the jury and the court via the bailiff violated then § 95-1913(d), RCM (1947), as "defendant's attorney was not notified nor present and had no way to protect his client from the jury's confusion." *Herron*, 169 Mont. at 198, 545 P.2d at 681. Specifically, the jury in *Herron* asked the bailiff to convey a question to the presiding judge as to whether they should sign the first verdict form before proceeding to the their determination of the next charge. The jury was confused by two separate instructions given to them. The judge and the bailiff conversed off the record, not in the presence of the parties. Thereafter, the bailiff returned to the jury room, misadvising them that they were to arrive at only one verdict and should therefore only sign one verdict form. The jurors were confused by this instruction, given that the defendant was charged with multiple counts, and the jury ultimately failed to return a verdict. *Herron*, 169 Mont. at 195-96, 545 P.2d at 680.

¶23 Here, the bailiff advised the jury "to find a common ground," and to "keep working on it," after the jury told the bailiff that they were deadlocked. Ultimately, the jury convicted Steele of assault on a peace officer. However, unlike the bailiff in *Herron*, the bailiff here did not misadvise the jury. Rather, the judge later stated, while not condoning the bailiff's actions, that she would have advised the jury of the same. In addition, the jury here did not disagree as to any of the testimony received, nor did they desire information regarding the law, as the jury did in *Herron*. Hence, § 46-16-503(2), MCA, was not

7

triggered, and the District Court did not err in denying Steele's motion for a mistrial on that basis.

¶24    While we do not conclude that the bailiff's comments to the jury require reversal on the facts here, we also want to make it clear that we do not condone the bailiff's actions. It is not within the prerogative of any court officer--other than the trial judge--to give instructions to the jury regarding its deliberations, however seemingly innocuous those might be. The bailiff here apparently made it a practice to make similar comments to other juries-- he testified to having "done it in the past." All we can say is that this bailiff is lucky; the next time he takes it upon himself to provide gratuitous advice to a trial jury, he might wind up costing the taxpayers thousands of dollars in retrying the case. We encourage the trial judges of this state to specifically instruct court officers and employees of the appropriate limits of their duties when dealing with trial juries.

### *Allen* Violation

¶25    The instruction at issue in *State v. Randall* (1960), 137 Mont. 534, 353 P.2d 1054, was similar to the instruction that the United States Supreme Court approved in *Allen v. United States* (1896), 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528. The instruction in *Randall* stated in pertinent part:

> In conferring together, you ought to pay proper respect to each others opinions and listen with disposition to be convinced of each others arguments . . . if the majority are for acquittal, the minority ought seriously to ask themselves whether they may not consider or alter the correctness of their judgment, which is not concurred in by most of those with whom they are associates, and discuss the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellows.

8

*Randall*, 137 Mont. at 540-41, 353 P.2d at 1057.

¶26    This Court decided to take the opposite view of that of the United States Supreme Court in *Allen*.  Specifically, in holding that it was error to give the above-quoted instruction in *Randall*, we held:

> The inevitable effect of the [above-quoted] instruction would be to suggest to the minority members of the jury that they ought to surrender their own convictions and follow the majority.  A vibrant pulsating, intelligent minority is a part of our American way of life.  The views of the minority often, with the passage of time, become the majority view. . . .  The majority view on any given subject is not always the correct view.
>
> It is not in line with our practice to discourage jurors from taking a view contrary to that entertained by a majority of the jurors.

*Randall*, 137 Mont. at 542, 353 P.2d at 1058.

¶27    Without addressing *Randall* we also considered an *Allen* instruction argument in *State v. George* (1986), 219 Mont. 377, 711 P.2d 1379.  In *George*, we held that the language used by the judge was not an *Allen*-type instruction, and, rather, was consistent with another instruction given.  Specifically, after receiving the jury's written verdict, the judge noticed that ten jurors had found the defendant guilty of operating a motor vehicle after having been adjudged an habitual traffic offender, while two jurors had found him not guilty.  The judge read the verdict into the record and then pointed out to the jury that they were required to reach a unanimous verdict, "one way or the other, guilty or not guilty."  In addition, the judge noted that if it was possible to get a unanimous verdict, the judge "would like to see one."  *George*, 219 Mont. at 380-82, 711 P.2d at 1381-82.

9

¶28 In holding that such an instruction to the jury did not have the inevitable effect of an *Allen*-type instruction, we noted that the judge clearly indicated to the jurors that no pressure was being put on them to return a unanimous verdict, and that the judge "merely asked that they return to the jury room and deliberate 'for awhile.'" *George*, 219 Mont. at 382-83, 711 P.2d at 1382-83.

¶29 Here again, the bailiff told the jury "to find a common ground" and to "keep working on it," after the foreperson advised him that the jury was deadlocked. Although not given by the judge--and although not condoned by the judge--these instructions, like those in *George*, did not attempt to pressure the jurors, nor did they assert to the minority jurors that their positions should change, as did the instruction at issue in *Randall*. Therefore, we conclude that these instructions "merely asked" the jurors to continue deliberating, and the District Court did not err in denying Steele's motion for a mistrial on that basis.

¶30 **2.    Did the District Court have sufficient evidence before it to support Steele's conviction of assault on a peace officer?**

¶31 Steele argues that for him to have committed the offense of assault on a peace officer, Officer Baumann must have feared serious bodily injury by use of a weapon. And, at most, Officer Baumann's testimony "supports the contention that he feared serious bodily injury by 'what reasonably appeared to be a weapon.'" As such, Steele argues that "Officer Baumann's testimony is not a sufficient basis for a rational trier of fact to have found that Mr. Steele caused a reasonable apprehension of injury 'by use of a weapon.'" Hence, Steele's conviction of assault on a peace officer should be vacated and the charge dismissed.

10

¶32    That State argues that "[w]hile Montana law does not require that Officer Bauman[n] actually perceive the weapon to feel threatened by it, in this case he did perceive the weapon the moment he heard Steel fire it."  As such, "[a] rationale trier of fact could have found beyond a reasonable doubt that when Steele fired his concealed weapon as Officer Bauman[n] approached" him, at that point Steele violated § 45-5-210(1)(b), MCA.

¶33    Section 45-5-210(1)(b), MCA, states that "[a] person commits the offense of assault on a peace officer or judicial officer if the person purposely or knowingly causes . . . reasonable apprehension of serious bodily injury in a peace officer or judicial officer by use of a weapon."  A weapon is defined as "an instrument, article, or substance that, regardless of its primary function, is readily capable of being used to produce death or serious bodily injury."  Section 45-2-101(78), MCA.  A person need not actually see a weapon to feel threatened by the use of that weapon.  *State v. Misner* (1988), 234 Mont. 215, 763 P.2d 23; *State v. Hagberg* (1996), 277 Mont. 33, 920 P.2d 86.

¶34    In *Misner*, the defendant left the county welfare office after becoming agitated with the welfare officer--an occurrence that had before frequently happened--and walked to his pickup.  The welfare officer then watched him get into his pickup, reaching with his right hand to grab his rifle.  At that point, the welfare officer "stood there in shock for a few seconds," scared that the defendant was "going to go off the deep end and do something."  Thereafter, the defendant closed the door of his pickup and drove off.  Misner was charged with two counts of felony assault.  *Misner*, 234 Mont. at 216-18, 763 P.2d at 24-25.

11

¶35 Misner argued that he could not have committed the offense of assault, as the welfare officer "neither saw nor came into close enough physical proximity to the gun." Hence, the State could not establish that the welfare officer was in reasonable apprehension of serious bodily injury by use of a weapon. *Misner*, 234 Mont. at 219, 763 P.2d at 25.

¶36 We held that because the welfare officer testified about his previous confrontations with Misner and about his apprehension of serious bodily injury, "it was not necessary that . . . [the welfare officer] personally observe the gun being waved at him in order to experience reasonable apprehension of serious bodily injury." *Misner*, 234 Mont. at 219, 763 P.2d at 25.

¶37 In *Hagberg*, the officer who pulled over the car in which Hagberg was the passenger, noticed an empty holster on the seat between Hagberg and the driver. The officer also noticed that Hagberg had a glazed look, smelled of alcohol, and was "bent over with his arms between his legs and his hands by the floor." *Hagberg*, 277 Mont. at 37, 920 P.2d at 88. At that point, the officer, in opening the car door, asked Hagberg to step out of the car. Hagberg slammed the car door on the officer's shoulder, after which the officer tackled Hagberg to the ground. In so doing, the officer grabbed a black single-action revolver from Hagberg's hand. *Hagberg*, 277 Mont. at 37-38, 920 P.2d at 88.

¶38 Relying on *Misner*, we held that the officer "had reason to be apprehensive of serious bodily injury," given that: (1) the officer "unequivocally testified to his apprehension of serious bodily injury;" (2) Hagberg smelled of alcohol; (3) Hagberg sounded belligerent and had a glazed look; (4) there was an empty holster on the seat next to Hagberg; and

12

(5) Hagberg looked as though he was holding a gun. *Hagberg*, 277 Mont. at 40, 920 P.2d at 90.

¶39 Here, Steele had one hand at the back of his waistband and one hand in the front, as he ran from the officers. Based on his prior knowledge of Steele, the officer believed that Steele might have a gun. As the officer approached Steele, he saw Steele turn towards him while at the same time raising his arms from his waistband. The officer thought at this moment that Steele was acquiring him as a target. Officer Baumann then heard a shot, after which he saw Steele drop a pistol that Steele was holding behind his back. During the short interval between hearing the gunshot and seeing Steele drop the pistol, Officer Baumann testified that he was worried about his physical safety and was in fear of his life. Thinking Steele was thereafter unarmed, Officer Bowman tackled him to the ground, and during the fall, another pistol that Steele was clutching in his front waistband dropped to the ground.

¶40 Similar to both victims' testimony in *Misner* and *Hagberg*, Officer Baumann testified that he was worried about his safety and was in fear of his life. In addition, like the officer's observations in *Hagberg*, Officer Baumann noticed that Steele was attempting to hold something in his waistband while fleeing, and, upon stopping, rose his hand from his waistband in a motion indicative to Officer Baumann of Steele targeting him. Further, Officer Baumann knew Steele, and from that knowledge was aware that Steele might have a gun on his person. Based on Officer Baumann's knowledge and observations, we hold, as we did in *Misner* and in *Hagberg*, that Officer Baumann did not actually have to see the pistol Steele had on his person in order to feel threatened by use of the pistol. Therefore, we

13

hold that sufficient evidence existed to support Steele's conviction of assault on a peace officer.

¶41 As Justice Cotter points out in her concurrence, the jury was advised, prior to their deliberations, that they should not surrender to the majority their honest opinions regarding the innocence or guilt of Steele. Hence, the dissent's argument that "[t]he bailiff failed to mention that no juror should give up his or her honest opinion concerning the guilt or innocence of Mr. Steele," is misplaced. The jurors had with them in the jury room all of the admitted jury instructions, including Instruction No. 34, as quoted by Justice Cotter in her concurrence. Requiring the bailiff to repeat this instruction--as the dissent seemingly propounds--in effect, asks the bailiff to take actions which this Court and the District Court clearly stated they did not condone. Indeed, the dissent first faults the bailiff *for advising* the jury that "we will be here until at least midnight." Yet, the dissent goes on to fault the bailiff *for failing to advise* the jury further regarding their honest opinions of Steele's innocence or guilt.

¶42 As to the problem with the bailiff's "here until at least midnight" statement, specifically the bailiff testified that "the Court has instructed me, or has made mention, that we will be here until at least midnight." Nowhere in this statement did the bailiff "indicate" --as the dissent argues--that "there could not be a hung jury for at least another three and one-half hours and possibly not even then." Rather--and quite simply--the bailiff advised the jury of the time frame under which they were operating on that particular day.

14

¶43 Finally, citing *George*, the dissent claims that "[i]n direct contradiction to applicable precedent, the jury was pressured into reaching a verdict." Interestingly, in agreement with *George*, we held that the jury was not pressured into reaching a verdict, given that, as in *George*, the jury was aware that they should not surrender their honest opinions to the majority under the pressure of returning a unanimous verdict. *See* ¶¶ 27-29.

¶44 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ JIM RICE

15

Justice Patricia O. Cotter concurs.

¶45     I concur in the Court's decision.  I write separately to add that the jury instructions, as given by the District Court, clearly set forth the correct rule with respect to the right of a juror to hold firm in his or her minority opinion.  The jury was told in Instruction No. 34, that "no juror should surrender an honest opinion as to the weight or effect of evidence or as to the innocence or guilt of the Defendant because the majority of the jury feels otherwise, or for the purpose of returning an unanimous verdict or to prevent a mistrial."  When faced with a motion for mistrial in *State v. George*, we found the submission to the jury of a similar instruction significant.  *State v. George* (1986), 219 Mont. 377, 382, 711 P.2d 1379, 1382-83.  I find the same to be significant here, and therefore concur.

                                                    /S/ PATRICIA O.
                                                    COTTER

16

Justice John Warner dissenting.

¶46    I must dissent from the Court's conclusion that the bailiff's actions do not require that the conviction of assault on a peace officer be reversed.

¶47    The actions of the bailiff are stated at ¶ 12 above. The first error made by the bailiff was in telling the jurors that they would be "here until at least midnight." This indicated not only that they should continue to deliberate, but that there could not be a hung jury for at least another three and one-half hours and possibly not even then.

¶48    Then, the bailiff went on to say that the jury needed to find a common ground. This is a direct statement that it was required there be a unanimous verdict. That is, some juror or jurors were going to have to change their vote. The bailiff failed to mention that no juror should give up his or her honest opinion concerning the guilt or innocence of Mr. Steele just to reach a unanimous verdict.

¶49    The bailiff's extraneous instruction had the effect of coercing minority juror or jurors into following the majority. In direct contradiction to applicable precedent, the jury was pressured into reaching a verdict. *George*, 219 Mont. at 382, 711 P.2d at 1382.

¶50    The assault on a peace officer conviction should be reversed and remanded for a new trial. I dissent from our failure to do so.


/S/ JOHN WARNER


Justice W. William Leaphart joins in the foregoing dissent.


/S/ W. WILLIAM LEAPHART


17