# FILED

March 1 2011

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA



DA 10-0016

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 34

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

KIM A. NORQUAY, JR.,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 07-079
Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Joslyn Hunt, Chief Appellate Defender; Jennifer A. Hurley, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Steve Bullock, Montana Attorney General; Mardell Ployhar, Assistant
Attorney General, Helena, Montana

            Gina Dahl, Hill County Attorney, Havre, Montana

            Daniel Guzynski, Special Deputy County Attorney, Helena, Montana

                    Submitted on Briefs:   December 15, 2010
                             Decided:   March 1, 2011

Filed:

_____
                          Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 A Montana jury found Kim A. Norquay, Jr. (Norquay) guilty of deliberate homicide, § 45-5-102(1)(b), MCA, and tampering with physical evidence, § 45-7-207(1)(a), MCA. Norquay appeals.

¶2 We review the following issues on appeal:

¶3 1. *Whether the District Court's admission of the State's expert DNA witness through a videotaped deposition violated Norquay's right to confront the witness.*

¶4 2. *Whether the District Court's Allen-instruction given to a deadlocked jury constituted an improperly coercive instruction.*

¶5 3. *Whether the prosecutor's comments at trial constituted prosecutorial misconduct.*

FACTUAL AND PROCEDURAL HISTORY

¶6 Nathan Oats (Oats) and Georgetta Oats (Georgetta) found Lloyd Kvelstad (Kvelstad) unconscious and severely beaten at about 1:30 a.m. on November 25, 2006. Oats testified that he found Kvelstad lying on a couch with his pants down around his legs at Melissa Snow's (Snow) house. Kvelstad's face was beaten beyond recognition and he had a black string around his neck. Oats told Georgetta to call 911.

¶7 Kvelstad, Norquay, James Main Jr. (Main), Billy the Boy (Billy), Jason Skidmore (Skidmore), Joseph Red Elk (Red Elk), and Thomas Anderson (Anderson) had gathered at Snow's house to drink alcohol earlier that night. Norquay, Main, Snow, and Billy were still at the house when Oats arrived and found Kvelstad. Georgetta announced that the police were coming and Main attempted to leave. Oats restrained Main and held him until the

2

police arrived. Norquay fled out a side door. Paramedics determined that Kvelstad was dead.

¶8    The State charged Norquay with deliberate homicide on the theory that Norquay had participated in the commission of an aggravated assault of Kvelstad. The State also charged Norquay with tampering with physical evidence based upon a witness's statement that Norquay had wiped blood off his shoe. Norquay had an eight-day jury trial.

¶9    Red Elk testified to the events leading up to Kvelstad's death. Red Elk testified that several of the men had verbally and physically assaulted Kvelstad. Red Elk watched Main and Skidmore put Kvelstad into several choke holds that caused Kvelstad to lose consciousness. Skidmore pulled up Kvelstad's underwear until they ripped off. Red Elk testified that Norquay slapped Kvelstad's face and would not allow Kvelstad to sit down. He also testified that Norquay took his belt off, unbuttoned, and unzipped his pants, attempted to pull down Kvelstad's pants, and announced that he was going to "fuck" Kvelstad. Another of the revelers forced Norquay to stop. Red Elk also testified that he had heard Norquay talking with Main about whether the two of them should kill Kvelstad.

¶10   Kvelstad eventually passed out from intoxication. Red Elk watched Snow and Skidmore put Kvelstad in a bed. Red Elk left Snow's house with Skidmore shortly thereafter. Red Elk testified that Kvelstad was still breathing and was not bloody when he last saw him. Snow testified to a similar version of the night's events. She also testified that she saw Norquay remove the string from his sweatshirt. Another witness testified that Norquay told her that he had strangled Kvelstad using a string from his sweatshirt.

3

¶11     Several other witnesses testified that Norquay had made incriminating statements after Kvelstad's death. One witness testified that she overheard Norquay brag to someone on the phone, "Did you hear I'm a murderer?" Norquay voluntarily met with police. Norquay denied kicking, beating, or strangling Kvelstad. Norquay claimed that Kvelstad had passed out from drinking too much. The Deputy State Medical Examiner testified that Kvelstad had likely died as a result of blunt force trauma to the head and probable ligature strangulation.

¶12     One of the State's experts testified that the tread on Norquay's shoes corresponded with a bloody shoe impression left on Kvelstad's sweatshirt. Norquay's expert refuted this testimony. The State also provided testimony from a DNA expert with the Montana Crime Lab through a videotaped deposition. Norquay originally requested the DNA evidence from the State Crime Lab. The DNA expert provided both potentially exculpatory and potentially inculpatory testimony. Both parties relied on portions of the DNA expert's testimony to their advantage. The jury convicted Norquay on all counts. Norquay appeals.

STANDARD OF REVIEW

¶13     This Court reviews a district court's evidentiary rulings for abuse of discretion. *In re T.J.B.*, 2010 MT 116, ¶ 14, 356 Mont. 342, 233 P.3d 341. Norquay argues that the Court's decision to allow the State's videotaped deposition violated his constitutional right to confront witnesses against him. A district court has no discretion in the correct interpretation of the Constitution. *State v. Parker*, 2006 MT 258, ¶ 11, 334 Mont. 129, 144 P.3d 831. This Court reviews de novo a court's interpretation of the Sixth Amendment. *In re T.J.B.*, ¶ 14.

4

¶14    We review jury instructions to determine whether, as a whole, they fully and fairly provide instruction on the applicable law. *Id*. at ¶ 16. A district court's discretion in formulating instructions is reversible only if the instructions prejudicially affect the defendant's substantial rights. *Id*. The Court conducts plenary review of discretionary rulings when the court bases the discretionary ruling upon an interpretation of the Constitution. *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 26, 351 Mont. 464, 215 P.3d 649.

DISCUSSION

¶15    1. *Whether the District Court's admission of the State's expert DNA witness through a videotaped deposition violated Norquay's right to confront the witness.*

¶16    Officers arrested Norquay in July 2007 and the court originally scheduled Norquay's trial for May 2008. The court granted several continuances to accommodate witness availability and attempted to set the trial date for January 5, 2009, more than two years after Kvelstad's death. The parties agreed to reschedule again to accommodate the DNA expert, Megan Ashton (Ashton), who was expecting a baby in mid-December 2008 and would be on maternity leave in January 2009. The court moved up the trial date to November 12, 2008.

¶17    Ashton informed defense counsel in October 2008, that her doctor had prohibited her from traveling from her home in Missoula to Havre for the November trial. Norquay filed another motion to continue the trial until January 2009. The State unsuccessfully attempted to replace Ashton with another DNA expert. The State opposed the motion to continue. The State moved instead for an order to use a videotaped deposition of Ashton at trial in place of

5

her live testimony. Norquay opposed the videotaped deposition. The court granted the State's motion to depose Ashton and denied Norquay's motion to continue the trial.

¶18 The court provided several reasons for its decision to allow the videotaped deposition. The court recognized the difficulty in trying to accommodate the schedule of approximately 50 other witnesses. The court cited the fact that two years had elapsed since the victim's death and the effect that this delay could have on witnesses' memories. The court further reasoned that Ashton was not a witness with personal knowledge of the facts giving rise to the events. Finally, the court discussed its need to accommodate schedules for the two judicial districts over which it presided. The court concluded that another continuance likely would postpone the trial significantly. The videotaped deposition took place six days before trial. Counsel for both parties were present. Norquay cross-examined Ashton.

¶19 Norquay argues that the court's admission of Ashton's videotaped testimony violated his Sixth Amendment right to confront witnesses against him. He contends that the State failed to establish that Ashton was unavailable because the State had not made a good faith effort to present the witness at trial. The court deemed Ashton unavailable and concluded that Norquay's confrontation rights could be protected adequately through a videotaped deposition with all parties present.

¶20 Both the federal and Montana constitutions provide defendants with the right to confront witnesses against them. U.S. Const. amend. VI; Mont. Const. art. II, § 24. The ability to cross-examine a witness represents the cornerstone of a defendant's right to

6

confront the witnesses against him. *In re T.J.B.*, ¶ 18. The Confrontation Clause also normally requires that a witness testify in court. *State v. Hart*, 2009 MT 268, ¶ 23, 352 Mont. 92, 214 P.3d 1273. The court may allow recorded witness testimony at trial under limited circumstances. The court first must deem the witness unavailable for trial. *Hart*, ¶ 23 (citing *Crawford v. Wash.*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004)); §§ 46-15-201, -204, MCA; M. R. Evid. 804. The court also must determine that the defendant has had an opportunity to cross-examine the witness in some forum. *Hart*, ¶ 23.

¶21 The State satisfied the second element here. Norquay cross-examined Ashton at her deposition. Norquay challenges only the court's determination that Ashton was unavailable for trial. A court may deem a witness unavailable if a physical illness renders the witness unable to testify. M. R. Evid. 804(a)(4). The proponent of the testimony of an unavailable witness in a criminal case bears the burden of demonstrating that it made a "good faith effort" to secure the witness's attendance at trial. *Hart*, ¶ 24 (citing *Barber v. Page*, 390 U.S. 719, 724-25, 88 S. Ct. 1318, 1322 (1968)). The court applies a reasonableness standard to the question of whether the State made a good faith effort to procure a witness, based on the totality of the circumstances. *Hart*, ¶ 24.

¶22 This Court has not yet decided an unavailability case involving a pregnant witness for Confrontation Clause purposes. We have considered whether the State made a good faith effort to procure a witness in a criminal trial for Confrontation Clause purposes under other circumstances. *Hart*, ¶¶ 18-26; *State v. Widenhofer*, 286 Mont. 341, 351-54, 950 P.2d 1383, 1389-90 (1997). We concluded in *Hart* that the court properly had admitted videotaped

7

testimony of a material witness who had fled Montana, had eluded police officers, and had refused to testify. *Hart*, ¶ 26. The State deposed the witness five days before trial and counsel for the defendant had cross-examined the reluctant witness. *Id.* The State had not made a good faith effort to procure the witness in *Widenhofer*, however, when the State had subpoenaed the witness only the night before trial and the witness had not appeared at trial. *Widenhofer*, 286 Mont. at 352-53, 950 P.2d at 1390.

¶23    We have also considered whether good cause justified delaying a trial for a pregnant witness in *City of Helena v. Roan*, 2010 MT 29, 355 Mont. 172, 226 P.3d 601. The City of Helena cited Roan for reckless driving after witnesses reported that they had watched Roan spin "brodies" in a parking lot. *Roan*, ¶ 2. The court allowed the City to continue the trial based on testimony that two key witnesses, Nick Norton (Norton) and Megan Miller (Miller), would not be available to testify due to Miller's pregnancy. *Id.* at ¶ 3. Miller never testified at trial, but her fiancé, Norton, testified. *Id.* at ¶ 11. Roan argued that the City had not demonstrated good cause to justify the delay. *Id.* We concluded that Miller's pregnancy, which required a cesarean, and her necessary recovery time, demonstrated good cause for delaying the trial. *Id.* at ¶¶ 15-16.

¶24    Other jurisdictions have addressed the unavailability of the witness question in the context of a late-term pregnancy. Courts have considered factors in determining witness unavailability such as the nature of the illness, the expected time of recovery, the reliability of the evidence concerning the illness, the importance of the absent witness to the case, and other special circumstances. *United States v. McGuire*, 307 F.3d 1192, 1205 (9th Cir. 2002);

8

*Ecker v. Scott*, 69 F.3d 69, 72 (5th Cir. 1995); *U.S. v. Faison*, 679 F.2d 292, 297 (3rd Cir. 1982).

¶25 The Ninth Circuit Court of Appeals deemed a witness in her seventh month of pregnancy unavailable to testify at a criminal trial. *McGuire*, 307 F.3d at 1205. The court recognized that it had been proper for a district court to rely on a physician's statement when assessing the availability of a pregnant witness. *Id.* The court also noted that the trial involved a large number of witnesses and defense attorneys, and a judge from another judicial district sitting by designation. *Id.* The Ninth Circuit Court of Appeals concluded that the court properly had decided not to delay the trial when it would have been forced to accommodate so many competing schedules. *Id.* Although *McGuire* involved a challenge to the testimony under Federal Rule of Evidence 804, not the Sixth Amendment, the same factors apply. *Ecker*, 69 F.3d at 72 n. 3. A challenge under the Confrontation Clause may require a stronger showing of unavailability. *Id.*

¶26 The facts of this case present circumstances more similar to *McGuire, Hart*, and *Roan*, than *Widenhofer*. Pregnancy involves a medical condition that poses special risks to a woman and her unborn child. The court properly relied upon the statements of Ashton's physician that she could not travel from Missoula to Havre to testify at the November trial. Although Ashton's doctors set her due date for mid-December, the court could not predict exactly when the baby would arrive or when Ashton would be ready to travel for trial after the birth. The court already had rescheduled once to accommodate Ashton's pregnancy and previously had rescheduled to accommodate other witnesses' schedules. The State

9

unsuccessfully had attempted to replace Ashton with another DNA expert. None were available.

¶27 This complex trial involved approximately 50 other witnesses whose schedules the court would have been required to accommodate. Efforts by the court to reschedule likely would have substantially delayed the trial. Ashton's videotaped deposition took place six days before trial with Norquay present. Norquay's counsel cross-examined Ashton. The jury had the opportunity to view the demeanor of the witness and evaluate her credibility. Ashton's testimony did not address a portion of the State's case that Norquay contested. In fact, Norquay had insisted that Ashton would provide exculpatory evidence necessary for his defense.

¶28 Looking to all the facts and circumstances we conclude that the State made a good faith effort to procure Ashton for trial and that the district court properly allowed the videotaped testimony. Unlike *Widenhofer*, the State had worked to schedule a trial that would accommodate all the witnesses and attempted to replace Ashton with another DNA expert. The court properly relied upon the statement of Ashton's physician in determining that she was unavailable to testify for trial. The court took the proper procedural steps in the form of a videotaped deposition taken several days before trial to protect Norquay's confrontation rights.

¶29 2. *Whether the District Court's Allen-instruction given to a deadlocked jury constituted an improperly coercive instruction.*

10

¶30    The jury deliberated for approximately seven hours on the first day of deliberations. The judge sent the jury a note at the end of the day asking whether they had made any progress. The foreman responded, "No deadlock." The foreman sent the court a note during the next morning's deliberation to inform the court that the jury was in a stalemate. The court convened the parties and informed them that it intended to read Montana Pattern Jury Instruction Criminal No. 1-121 (MPJIC 1-121) for potentially deadlocked juries.

¶31    Norquay's counsel objected to the instruction on the grounds that it violated his due process rights and unlawfully coerced the jury to render a verdict. The court overruled the objection and read the instruction to the jury. The jury reached a verdict about an hour and a half after receiving the instruction. Norquay appeals the following language in the District Court's jury instruction:

> The ultimate responsibility of the jury is to render a verdict in this case . . . The <u>final test</u> of the quality of your service will be in the verdict which you return to this Court. It is <u>only by rendering a verdict in this cause</u> that you can make a definite <u>contribution to efficient judicial administration</u> as you arrive at a just and possible verdict. [Emphasis added].

Mont. Pattern Jury Instr. Crim. 1.121 (2009). Norquay argues that the court improperly instructed the jury to consider matters irrelevant to their deliberations, specifically the "quality" of their service, making a "definite contribution to the administration of justice," and passing the "final test" of rendering a verdict.

¶32    The U.S. Constitution and the Montana Constitution entitle defendants to an uncoerced verdict. *U.S. v. Lowenfield*, 484 U.S. 231, 241, 108 S. Ct. 546, 552 (1988); *State v. Randall,* 137 Mont. 534, 540-42, 353 P.2d 1054, 1057-58 (1960). A coercive instruction

11

in Montana directs the minority jurors to reconsider their views in light of the majority. *Randall*, 137 Mont. at 542, 353 P.2d at 1058. The court cannot instruct the jurors that they have to reach a decision or pressure the jurors into returning a unanimous verdict. *Jenkins v. U. S.*, 380 U.S. 445, 445-46, 85 S. Ct. 1059, 1060 (1965); *State v. Steele*, 2004 MT 275, ¶¶ 28-29, 323 Mont. 204, 99 P.3d 210. Simply put, the court cannot place undue pressure upon the jury to reach a verdict.

¶33 An *Allen*-instruction is a supplemental jury instruction given when jurors are apparently deadlocked. More than a century ago, the U.S. Supreme Court first upheld an *Allen*-instruction given to a deadlocked jury that instructed the jurors in the minority to reconsider their views in light of the contrary views held by the majority. *U.S. v. Allen*, 164 U.S. 492, 17 S. Ct. 154 (1896). The name "*Allen*-instruction" or "*Allen*-charge" derives from this case. The Montana Supreme Court first considered an *Allen*-instruction in *Randall* and concluded that an instruction that asked the minority jurors to reconsider their views in light of the contrary majority views constituted an objectionably coercive instruction. *Randall*, 137 Mont. at 540-42, 353 P.2d at 1057-58.

¶34 The Court in *Randall* purposefully took "the opposite view" of the U.S. Supreme Court when it did not allow the *Allen*-instruction that singled out the minority jurors and asked them to reconsider their views. *Randall*, 137 Mont. at 542, 353 P.2d at 1058. The Court concluded that the inevitable effect of such an instruction would be to suggest to the minority jurors that they ought to surrender their own convictions and follow the majority. *Id*. The Court noted that "[a] vibrant, pulsating, intelligent minority is a part of our

12

American way of life." *Id.* The Court ultimately concluded that the language that coerced the minority to reconsider their views in light of the majority constituted the only objectionable language in the jury instruction. *Randall*, 137 Mont. at 543, 353 P.2d at 1058.

¶35 The Court allowed *Allen*-instructions in Montana after *Randall* that did not instruct the minority jurors to surrender their opinions in light of the majority views. *State v. Bieber*, 2007 MT 262, ¶ 70, 339 Mont. 309, 170 P.3d 444; *State v. Cline,* 170 Mont. 520, 540, 555 P.2d 724, 736 (1976). MPJIC 1-121 now constitutes Montana's pattern *Allen*-instruction that developed after the Court in *Randall* had rejected an earlier version. The language that Norquay challenges derives from this instruction. MPJIC 1-121 no longer contains language that instructs the minority jurors to reconsider their views in light of the majority.

¶36 This Court has approved the language in MPJIC 1-121 on several occasions. *Bieber*, ¶ 70; *Cline,* 170 Mont. at 540, 555 P.2d at 736. We have not specifically discussed, however, the provision that Norquay challenges. The defendant in *Cline* challenged the same jury instruction that Norquay challenges and similarly argued that the instruction led the jury to believe that it should take into account irrelevant matters such as the judicial process, the selection of jurors, and the whole system rather than the facts of the case. *Cline,* 170 Mont. at 539, 555 P.2d at 736. The Court concluded, however, that the instruction did not single out the minority, and that the court did not pressure the jurors into reaching a verdict. *Cline,* 170 Mont. at 540, 555 P.2d at 736. We therefore concluded that the *Allen*-instruction in *Cline* did not constitute an objectionably coercive instruction. *Id*. We concluded that "unless we are to outlaw any instruction to the jury during the course of its

13

deliberations . . . it is difficult to draw a more innocuous instruction." *Id*. The Court upheld the same jury instruction again in *Bieber* based on the reasoning in *Cline*. *Bieber*, ¶ 70.

¶37 The *Allen*-instruction given at Norquay's trial did not contain language that instructed the minority jurors to reconsider their views. The instruction was nearly identical to the instruction given in *Cline* and *Bieber*. The instruction thereby comported with the applicable law in Montana. *Bieber*, ¶ 70; *Cline*, 170 Mont. at 540, 555 P.2d at 736; *Randall*, 137 Mont. at 542, 353 P.2d at 1058. The jury had ample time to deliberate and nothing in the facts indicate that patently coercive circumstances existed. The court did not put undue pressure on jurors to reach a unanimous verdict. The instruction stated that the jurors "should not surrender [their] honest convictions . . . for the mere purpose of returning a verdict." The instruction that Norquay challenges does not constitute an objectionably coercive instruction. *Id*. The court properly instructed the jury on the law. *Id*.

¶38 We are persuaded, however, to reconsider the "final test" language in MPJIC 1-121 that Norquay challenges. Although we find the instruction unobjectionable in Norquay's case, we disagree with the conclusion in *Cline* that MPJIC 1-121 is an "innocuous instruction." We take this opportunity to carefully evaluate the wisdom of the continued use of the "final test" language in MPJIC 1-121.

¶39 Other courts, commentators, and the American Bar Association have scrutinized the continued use of *Allen*-instructions. *See U.S. v Brown*, 411 F.2d 930, 932-34 (7th Cir. 1969); *U.S. v. Fioravanti*, 412 F.2d 407, 414-20 (3rd Cir. 1969); *Thaggard v. U.S.*, 354 F.2d 735, 739-41 (5th Cir. 1965) (Coleman, J., concurring); *U. S. v. Seawell*, 550 F.2d 1159, 1162 n. 4

14

(9th Cir. 1977) (listing state courts that have banned or restricted the use of *Allen*-instructions); s*ee also, Note, Due Process, Judicial Economy, and the Hung Jury: A Reexamination of the Allen Charge*, 53 Va. L. Rev. 123 (1967); Paul Marcus, *The Allen Instruction in Criminal Cases: Is the Dynamite Charge about to Be Permanently Defused?*, 43 Mo. L. Rev. 613 (1978); *ABA Standards for Criminal Justice Discovery and Trial by Jury*, Standard 15-5.4, 255 (3d ed., ABA 1996). We recognize that courts have expressed wariness of *Allen*-instructions and that a growing trend exists to eliminate, in particular, the "final test" language in *Allen*-instructions. *Jones v. U.S.*, 946 A.2d 970, 973-74 (D.C. 2008); *Thompson v. Md.*, 371 Md. 473, 486, 810 A.2d 435, 443 (Md. 2002); *Idaho v. Flint*, 114 Idaho 806, 812, 761 P.2d 1158, 1164 (Idaho 1988).

¶40 The Maryland Supreme Court has struck language in an *Allen*-instruction that suggests that the jury's "final test" requires them to make a determination of guilt or innocence, rather than to stay true to any individual convictions or opinions. *Thompson*, 371 Md. at 486, 810 A.2d at 443. Other courts have considered this same language in an *Allen*-instruction and similarly deemed it to be coercive. *Flint*, 114 Idaho at 812, 761 P.2d at 1164; *Jones*, 946 A.2d at 973-74. Both the Idaho Supreme Court and the Arizona Supreme Court have strongly disapproved of the use of *Allen*-instructions altogether reasoning that they are inherently coercive. *Flint*, 114 Idaho at 812, 761 P.2d at 1165; *Ariz. v. Smith*, 108 Ariz. 121, 124, 493 P.2d 904, 907 (Ariz. 1972).

¶41 The Maryland Supreme Court also noted that the final test language did not reasonably adhere to ABA standards. *See ABA Standards for Criminal Justice Discovery*

*and Trial by Jury*, at 255. The court concluded that the concept of a final test implies a standard of service to which a juror should aspire "that requires a verdict to be reached rather than one that requires consideration of individual conviction." *Thompson*, 371 Md. at 486, 810 A.2d at 443. The District of Columbia Court of Appeals applauded the Maryland Supreme Court for its unanimous decision in *Thompson*. *Jones*, 946 A.2d at 974. The District of Columbia Court of Appeals recognized problematic language at issue in its *Allen*-instruction that failed to include any language "that reminded the jurors not to surrender their honestly held convictions, even if that prevented agreement." *Id*. The court recognized that the instruction seemed "one-sided" in favor of reaching an agreement. *Id.*

¶42 The jury's ultimate responsibility is not to render a unanimous verdict of either guilt or innocence, but to consider carefully the facts presented at trial. Our jury system aspires to produce fair and accurate factual determinations in each case. Although the court here did not exert undue pressure on the jury to render a verdict when it gave MPJIC 1-121, no reason exists to continue to use the "final test" language in Montana's pattern criminal jury instructions. An *Allen*-instruction given in Montana courts should closely comport with ABA Standard 15-5.4 and eliminate the "final test" language. *See ABA Standards for Criminal Justice Discovery and Trial by Jury*, at 255.

¶43 We therefore adopt the following changes to MPJIC 1-121 to be used in future cases in which the court determines an *Allen*-instruction to be necessary:

> The judicial process assigns tasks to the <u>people involved in the case.</u> ~~the various units.~~ It is the task of the witnesses to testify truthfully <u>to the facts as they recall them.</u> ~~as they recall the facts.~~ It is the task of the lawyers to prepare the case for final submission to the trier of the facts, the jury. It is the task of

16

the Judge to preside, to instruct you as to the law, and to rule on ~~the admissibility of the~~ whether certain evidence will be allowed at trial. It is the task of the jury to decide the case. ~~The ultimate responsibility of the jury is to render a verdict in this cause~~. You are not ~~partisan nor are you~~ advocates in this matter; you are ~~the~~ neutral judges~~; you are the judges~~ of the facts. It is you and you alone that can ~~render a verdict in~~ decide this ca~~u~~se. There is no reason to believe that any other 12 ~~men and women~~ people would possess any more ability, intelligence, and courage to do the ~~ultimate~~ task assigned to a jury under the American system of justice.

~~The final test of the quality of your service will be in the verdict which you return to this Court. It is only by rendering a verdict in this cause that you can make a definite contribution to efficient judicial administration as you arrive at a just and possible verdict.~~ The purpose of this instruction is to encourage you to collaborate with your fellow jurors in order to reach a just and fair verdict in this case. This instruction is not meant to coerce or to force a verdict. You should take as much time as needed in your deliberations.

~~We have never asked, as a matter of fact we have instructed you, that~~ You should not surrender your honest convictions in this matter for the mere purpose of returning a verdict or solely because of the opinion of other jurors. This does not mean, however, that you should avoid ~~the~~ your task ~~assigned to you~~ of rendering a verdict in this case.

This instruction is not more important than any other instruction I have previously given you. You should consider this instruction together with, and as part of, all the other instructions. Please return to your jury room and, again, diligently and earnestly resume your deliberations.

¶44    3. *Whether the prosecutor's comments at trial constituted prosecutorial misconduct.*

¶45    Norquay next argues that the prosecutor engaged in misconduct that deprived Norquay of his right to a fair and impartial trial. The parties dispute the State's characterization of Red Elk's testimony. Red Elk testified that Norquay had his own pants down, and that Norquay had claimed that "he was going to fuck [Kvelstad] right there." The State used the word "rape" instead of "fuck" several times at trial. Norquay argues that the prosecutor's statement that Norquay had threatened to "rape" the victim inflamed the jury.

17

Norquay contends that Red Elk testified that Norquay had been joking, and that Norquay had not threatened Kvelstad. Norquay also argues that the State had misstated the elements of homicide at trial and wrongly attacked the defense's cross-examination tactics.

¶46 Norquay makes these arguments for the first time on appeal. We generally do not review issues raised for the first time on appeal. *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.2d 79. The Court may review claims not raised in the district court under the plain error doctrine. *Id.* We engage in plain error to prevent a manifest miscarriage of justice, to prevent fundamental unfairness, and to uphold the integrity of the judicial process. *Id*. A prosecutor may comment on the gravity of the crime charged, the volume of the evidence, the credibility of the witnesses, and the legal principles involved in the case. *State v. Green*, 2009 MT 114, ¶ 33, 350 Mont. 141, 205 P.3d 798. Our review of the record does not establish that the prosecutor engaged in misconduct that violated Norquay's substantial rights. We decline to apply plain error review. We likewise determine that Norquay's counsel did not provide ineffective assistance of counsel when he failed to object to the prosecutor's comments at trial.

¶47 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ JIM RICE

18