FILED

08/06/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0136

DA 23-0136

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 165

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

WILLIAM TREVOR CASE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Anaconda-Deer Lodge, Cause No. DC-21-100
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Nathan D. Ellis, Ellis Law, PLLC, Helena, Montana

            Christopher R. Betchie, Hyll, Swingley, & Betchie, P.C., Helena,
Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Michael P. Dougherty,
Assistant Attorney General, Helena, Montana

            Ben Krakowka, Anaconda-Deer Lodge County Attorney, Anaconda,
Montana

Submitted on Briefs:  February 14, 2024
Decided:  August 6, 2024

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Trevor Case appeals a February 24, 2023 judgment from the Third Judicial District Court, Deer Lodge County, following a December 8, 2022 jury verdict of Assault on a Peace Officer, a felony, in violation of § 45-5-210, MCA.

¶2 We restate the issues on appeal as follows:

*Issue One: Did the District Court err in denying Case's motion to suppress evidence obtained pursuant to a warrantless entry into his home?*

*Issue Two: Did the District Court abuse its discretion in denying Case a new trial based on an alleged* Brady *violation?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 Law enforcement responded to Case's home on September 27, 2021, after receiving a report from his ex-girlfriend, J.H., that Case had threatened suicide during a phone call with her that evening.

¶4 J.H. had assumed Case was drinking during the phone call because he was acting "erratic." She became concerned when Case stated that "he was going to get a note or something like that" and planned to commit suicide. After attempting and failing to deescalate the conversation, J.H. heard a "clicking" that sounded like a cocking pistol. J.H. told Case she was going to call the police, and Case threatened harm to any officers that came to his home if she did. J.H. continued pleading with Case until she heard a "pop" and "thought he pulled the trigger, because it was just dead air." The phone call did not disconnect, but Case was unresponsive. After reporting the call to the police, J.H. immediately drove to Case's home.

2

¶5 Three officers, Captain Dave Heffernan, Sergeant Richard Pasha, and Officer Blake Linsted, initially responded to Case's home. J.H. arrived at the scene shortly thereafter and described Case's threats to the officers. When she was asked whether she was "concerned about [Case] and possibly what he'd done to himself," she replied "Absolutely."

¶6 Heffernan called Chief Bill Sather for assistance because of the threats of harm to officers and the otherwise delicate nature of the situation. The officers did not consider obtaining a warrant to enter Case's home because "it wasn't a criminal thing. [They] were going in to assist him." Sather arrived at the scene approximately 30 minutes after the other officers.

¶7 Case did not respond to the initial door knock, nor did he respond when officers knocked on and yelled through an open window where a light was on. Meanwhile, Pasha and Linsted peered through each of Case's windows to look for evidence of an injury, indications that Case needed help, or signs of danger. All the officers could see through the windows were empty beer cans, an empty handgun holster, and a notepad on a table.

¶8 The officers were hesitant to enter Case's home because of J.H.'s report that Case had threatened them harm. Additionally, they were familiar with Case's history of alcohol abuse and mental health issues. The officers were aware, for example, that Case had previously threatened suicide at the local school where he taught, and the school was locked down because he had a weapon. Case's coworkers eventually confiscated his vehicle and the weapon so Case could not hurt himself. Another time, officers responded to Georgetown Lake where Case was reportedly under the influence and acting erratically in his parked truck. When officers arrived, Case generally acted obstinately and refused to

3

exit his vehicle. After eventually stepping out, Case quickly reached back into the truck against the officers' warnings. The officers perceived Case's behavior as an attempt to elicit a defensive response, i.e., a "suicide-by-cop."

¶9 Before entering Case's home, Heffernan thus returned to the station to retrieve a ballistic shield for protection. Pasha and Linsted retrieved qualified personal long barrel guns from their patrol car because they have customized fits, they are equipped with lights and optics, and the officers are generally more comfortable using them in dangerous situations.

¶10 Sather made the decision to enter Case's home roughly forty minutes after the officers first arrived.

¶11 The officers opened the unlocked front door, announced themselves, and continued to loudly identify themselves as they moved through Case's home. Heffernan left the ballistic shield on a sofa immediately after entering the home, due to its bulk. The officers were reportedly "yelling the whole time" they were in the home to continue announcing themselves. While the officers were clearing the first floor, they again saw the holster and notepad they had seen from outside, upon which was written what "looked like a suicidal note." Heffernan and Sather then moved to the basement, where Case kept his bedroom, while Pasha and Linsted moved upstairs.

¶12 As Pasha moved through an upstairs bedroom, Case "jerked open" a closet curtain. Pasha observed a "dark object" near Case's waist, and instantaneously aimed at and shot Case in the abdomen. Case fell to the floor, and Linsted entered the room and immediately began administering first aid. As Heffernan and Sather came into the room moments later,

4

Heffernan noticed and secured a handgun that was lying in a laundry hamper just outside the closet, next to Case.

¶13 As Linsted helped Case to the ambulance outside, Sather secured both Pasha and Case's firearms and immediately called the State Department of Criminal Investigation (DCI) for instructions on next steps.

¶14 Pasha testified at both the suppression hearing and at trial that he was nervous the entire time he was in Case's home. He testified that when he saw the curtain flash open, he saw Case with an "aggressive like look on his face" and "gritted" teeth. Pasha saw what appeared to be a black object coming out of the curtain, and further testified that he believed the object was a gun and that he was about to be shot.

¶15 On October 1, 2021, Case was charged by Information with Assault on a Peace Officer. The Information was amended on December 15, 2021, to further provide that Case "knowingly or purposefully caused reasonable apprehension of serious bodily injury in Sgt. Richard Pasha when he pointed a pistol at Sgt. Richard Pasha."

¶16 Case filed three pretrial motions on December 17, 2021: a motion to dismiss for lack of probable cause, a motion in limine to suppress evidence of prior bad acts, and a motion to suppress all evidence obtained by law enforcement in its "illegal search and seizure of Defendant and his residence."

¶17 On January 5, 2022, the State filed a second amended information, clarifying the charge that Case "knowingly or purposefully caused reasonable apprehension of serious bodily injury in Sgt. Richard Pasha when he pointed a pistol, *or what reasonably appeared to be a pistol*, at Sgt. Richard Pasha." (Emphasis added.)

5

¶18 Following a February 14, 2022 hearing, Case's request to exclude any evidence related to an altercation at the 7 Gables Bar (Georgetown) was granted. Otherwise, his motions to dismiss and suppress were denied.

¶19 During trial, Pasha testified that he had previously been shot at when responding to a crime scene. He further testified that it contributed to his hesitance to enter Case's home. Case did not ask Pasha about this incident on cross-examination.

¶20 The jury returned a guilty verdict on December 8, 2022.

## STANDARD OF REVIEW

¶21 Our review of constitutional questions is plenary. *State v. Ilk*, 2018 MT 186, ¶ 15, 392 Mont. 201, 422 P.3d 1219 (citation omitted). We review the factual findings underlying a district court's denial of a motion to suppress for clear error, and we review the application of those facts to relevant laws for correctness. *State v. Wakeford*, 1998 MT 16, ¶ 18, 287 Mont. 220, 953 P.2d 1065 (citation omitted). Whether a motion for a new trial was properly denied is reviewed for an abuse of discretion. *Ilk*, ¶ 15 (citation omitted).

## DISCUSSION

¶22 On appeal, Case argues the District Court erred by denying his motion to suppress evidence obtained after the officers entered his home without a warrant. Case further contends the District Court abused its discretion by denying his motion for a new trial when the State did not disclose that Pasha was shot at during an investigation three months prior to entering Case's home.

¶23    *Issue One: Did the District Court err in denying Case's motion to suppress evidence obtained pursuant to a warrantless entry into his home?*

¶24    In Montana, a peace officer's warrantless entry into an individual's home is per se unreasonable because citizens are afforded an expectation of privacy and protection from unlawful searches and seizures in their homes. U.S. Const. amend. IV; Mont. Const. art. II, §§ 10, 11; *State v. Stone*, 2004 MT 151, ¶ 18, 321 Mont. 489, 92 P.3d 1178.

¶25    We have adopted a few narrow exceptions to that general rule. An individual may knowledgeably and voluntarily consent to a search, for example. *State v. Rushton*, 264 Mont. 248, 257, 870 P.2d 1355, 1361 (1994) (citation omitted). Additionally, a warrantless search may be lawful if there are both exigent circumstances and probable cause for violation of a criminal statute. *Stone*, ¶ 18 (citing *State v. Saxton*, 2003 MT 105, ¶ 26, 315 Mont. 315, 68 P.3d 721); *see also Wakeford*, ¶ 22. A third category of exceptions includes welfare checks arising under the community caretaker doctrine, when a peace officer acts on a duty to promptly investigate situations "in which a citizen may be in peril or need some type of assistance from an officer." *Estate of Frazier v. Miller*, 2021 MT 85, ¶ 16, 404 Mont. 1, 484 P.3d 912 (citations omitted).[1]

_____

[1] The Dissent, ¶ 58, argues that the community caretaker doctrine "is not an exception to the warrant requirement." The premise stems from our statement in *State v. Lovegren* that "this category of interaction with police 'does not involve any form of detention at all and, therefore, does not involve a seizure.'" Dissent, ¶ 58 (citing *State v. Lovegren,* 2002 MT 153, ¶ 16, 310 Mont. 358, 51 P.3d 471). We have repeatedly described the community caretaker doctrine as an exception to the warrant requirement. *Frazier*, ¶ 16; *Lovegren*, ¶¶ 14-16. Citizens maintain their rights to privacy—and thus protection from unreasonable entry into their homes—regardless of whether a seizure has occurred. In the event officers enter a home pursuant to their caretaker duties, a seizure does not occur unless and until a situation escalates into a criminal investigation. *State v. Nelson*, 2004 MT 13, ¶ 6, 319 Mont. 250, 84 P.3d 25 (citing *Lovegren*) ("Montana's version of the community caretaker doctrine . . . morphs into a seizure or an arrest because of an escalation of events which develop after the initial inquiry.").

¶26 A warrantless entry under Montana's community caretaker doctrine is unique from the other exceptions in that the circumstances giving rise to a welfare check on an individual in their home specifically *may not* implicate a criminal investigation. *Frazier*, ¶ 17 (citations omitted); Mont. Const. art. II, §§ 10, 11.

¶27 The United States Supreme Court recently expounded on the propriety of the community caretaker doctrine in *Caniglia v. Strom*, 593 U.S. 194, 141 S. Ct. 1596 (2021). There, Edward Caniglia sued law enforcement in a civil action after police officers searched his home and confiscated firearms inside without a warrant or consent.[2] *Caniglia*, 593 U.S. at 196-97, 141 S. Ct. at 1598. The First Circuit Court of Appeals ruled in favor of the State, premising its decision upon the community caretaker doctrine and Caniglia's threats of suicide. *Caniglia v. Strom*, 953 F.3d 112, 122-33 (1st Cir. 2020). The Supreme Court reversed, distinguishing the heightened protections individuals are afforded in their homes as opposed to motorists on public highways. *Caniglia*, 593 U.S. at 198-99, 141 S. Ct. at 1599 (citing *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523 (1973)).

---

[2] During an argument with his wife, Caniglia placed a pistol on the table and asked her to "shoot [him] and get it over with." *Caniglia*, 593 U.S. at 196, 141 S. Ct. at 1598. Caniglia's wife left and spent the night in a hotel. *Caniglia*, 593 U.S. at 196, 141 S. Ct. at 1598. When the wife was unable to reach Caniglia by phone in the morning, she called the police and requested a welfare check. *Caniglia*, 593 U.S. at 196-97, 141 S. Ct. at 1598. Responding officers ultimately persuaded Caniglia to go to the hospital for a mental health evaluation, but only after stipulating that they would not confiscate his firearms. *Caniglia*, 593 U.S. at 197, 141 S. Ct. at 1598. Once Caniglia left for the hospital, the officers confiscated firearms inside the home. *Caniglia*, 593 U.S. at 197, 141 S. Ct. at 1598. Caniglia ultimately sued under an unconstitutional search and seizure theory. *Caniglia*, 593 U.S. at 197, 141 S. Ct. at 1598. The First Circuit determined the officers had lawfully discharged their duties under the community caretaker doctrine. *Caniglia*, 593 U.S. at 197, 141 S. Ct. at 1598-99.

¶28 Case argues that *Caniglia* forbids our application of the community caretaker doctrine in a citizen's home, averring that the only circumstance where a peace officer may enter a home without a warrant or consent is when there are both exigent circumstances and probable cause for violation of a criminal statute. We are not persuaded by Case's narrow view of peace officers' caretaker obligations.

¶29 The *Caniglia* Court articulated its concern that permitting warrantless entries broadly under the community caretaker doctrine risks encompassing actions that violate citizens' Fourth Amendment rights. *Caniglia*, 593 U.S. at 198, 141 S. Ct. at 1599. Indeed, as Case suggests here, an ordinary citizen would be afforded less protection from unreasonable entries than a criminal if *every* circumstance suggesting that a welfare check *might* be prudent was constitutionally permissible. Without ruling that the doctrine is itself unreasonable per se, the Court implied that the requisite inquiry in cases where it might apply is whether there were exigent circumstances rendering the entry "reasonable." *Caniglia*, 593 U.S. at 198, 141 S. Ct. at 1599; *see also*, *Caniglia*, 593 U.S. at 204-05, 141 S. Ct. at 1602-03 (Kavanaugh, J., concurring) ("the Court's decision does not prevent police officers from taking reasonable steps to assist those who are inside a home and in need of aid . . . police officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide . . . .").

¶30 *Caniglia* established that the Fourth Amendment requires reasonable exigency to enter a home, and probable cause for any seizure after that point. Unlike the situation here, there was no exigency in *Caniglia* to justify the officer's entry, given Caniglia had

9

voluntarily left his home for a psychiatric evaluation by the time officers entered his home and seized his weapons. *Caniglia*, 593 U.S. at 196-97, 141 S. Ct. at 1598.

¶31 Our jurisprudence around the community caretaker doctrine is sufficiently narrow that it comports with *Caniglia* and aligns with Montana's heightened privacy protections. Mont. Const. art. II, § 10. In Montana, the doctrine may only apply when an officer's warrantless entry is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Frazier*, ¶ 17 (quoting *Lovegren*, ¶ 17). In such cases, there is neither a search nor seizure that would implicate Article II, Section 11, of the Montana Constitution. While an individual is entitled to a right to privacy in their home, a warrantless entry is permissible if it is reasonable given the facts and circumstances. *Caniglia*, 593 U.S. at 198, 141 S. Ct. at 1599 ("To be sure, the Fourth Amendment does not prohibit all unwelcome intrusions 'on private property,' *ibid.*—only 'unreasonable' ones.").[3]

¶32 We thus apply a three-factor test to determine whether the application of the community caretaker doctrine is reasonable:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the

---

[3] The Dissent, ¶ 56, opines that we "misapprehend[] *Caniglia*" because there, the U.S. Supreme Court "held that the community caretaker doctrine is *not* a standalone exception to the warrant requirement and did not permit warrantless entries into personal residences." (Emphasis in original.) While the *Caniglia* Court drew an important distinction between caretaker stops on public roadways and warrantless entries into individuals' homes, the Dissent fails to reconcile *Caniglia's* acknowledgment that the community caretaker doctrine may yet justify a warrantless entry into a home when exigent circumstances do, in fact, exist. *Caniglia*, 593 U.S. at 198, 141 S. Ct. at 1599. While the Dissent strains the facts to downplay the exigency that led to the officers' warrantless entry here, a comprehensive reading of the record indicates exigent circumstances were present.

10

citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

*Lovegren*, ¶ 25.

¶33 The first two prongs of our community caretaker test mirror the Ninth Circuit Court of Appeals' exigent circumstances standard for warrantless entry, but for the key fact that in Montana, a welfare check may not justify a warrantless entry in response to criminal activity alone.[4] Our cases have established that in cases involving crime, only exigent circumstances and probable cause together will justify a warrantless entry. *See Stone*, ¶ 18 (citing *Saxton*, ¶ 26); *see also Wakeford*, ¶ 22. When a warrantless entry is wholly divorced from a criminal investigation and is otherwise reasonable, like here, the probable

---

[4] The Ninth Circuit held "We now adopt a two-pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). Similar exigent circumstances standards are applied widely through the other circuits. *See Snipe*, 515 F.3d 947 at 952-53, and the standard is consistent with the U.S. Supreme Court's ruling in *Caniglia*.

cause element is "superfluous" and should not impede an officer's duty to ensure the wellbeing of a citizen in imminent peril. *Snipe*, 515 F.3d at 952.[5]

¶34 The Dissent posits that distinguishing criminal and non-criminal exigencies is "confusing and unnecessary," Dissent, ¶ 56. We find it essential to make sense of the probable cause element that our cases have incorporated into the exigent circumstances standard, ostensibly as a safeguard to Montanans' heightened right to privacy. Contrary to the Dissent's assertion, Dissent, ¶ 56, our caselaw does not yet have a "framework" for law enforcement to address situations like this, where probable cause that a crime has occurred simply does not exist despite a "need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Caniglia*, 593 U.S. at 198, 141 S. Ct. at 1599. In these scenarios, our "exigent circumstances plus probable cause" standard is unwieldy and risks grave consequences for individuals in need of care.

¶35 Rather than attempt to reconcile the conflict, the Dissent advances a sensible but unprecedented formulation of law, asserting that "the probable cause requirement under the exigency exception is not limited to only the commission of a criminal offense but applies to whether there is probable cause to believe a person is in imminent peril and in need of help." Dissent, ¶ 56. The lack of authority for this position is telling, given we

---

[5] The Ninth Circuit *did not* "recogniz[e] the requirement of both probable cause and exigency" in *Snipe*, as asserted by the Dissent, ¶ 63. Rather, the *Snipe* court described the probable cause element as "superfluous," because it may be "assumed that probable cause to associate the emergency with the place to be searched exists whenever law enforcement officers have an objectively reasonable basis for concluding that an emergency is unfolding in that place." *Snipe*, 515 F.3d at 952. We agree that the "probable cause" requirement would be superfluous here, too, because the record reflects an "objectively reasonable basis" for finding that an emergency was unfolding.

have only ever applied the probable cause standard to determine whether the facts "are sufficient to warrant a reasonable person to believe that the suspect *has committed an offense*." *Stone*, ¶ 18 (emphasis added).

¶36 Our formulation of the community caretaker doctrine encompasses non-criminal situations where a warrantless entry is essential to ensure the wellbeing of a citizen, but that would otherwise be forbidden for lack of criminal activity and probable cause. We are not issuing law enforcement "an open-ended license to enter a home upon a mere reasonable suspicion." Dissent, ¶ 66. When officers are engaged in a criminal investigation, there must be probable cause to justify a warrantless entry. *Stone*, ¶ 18. When acting in a caretaker's capacity, an officer's reasons for a warrantless entry must be reasonable and "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Lovegren*, ¶ 17.

¶37 The third and final *Lovegren* prong asks whether the officers took "any actions beyond [which would] constitute a seizure . . . ." *Lovegren*, ¶ 25. As discussed below, this third step is a central part of our discussion because the officers' actions following their entry into Case's home undoubtedly constituted a seizure, for which the analysis must "morph" from the community caretaker doctrine to the Fourth Amendment and Article II, Sections 10 and 11, of the Montana Constitution. *See Nelson* ¶ 6 (citing *Lovegren*).

¶38 Applying the *Lovegren* factors here, the officers were acting on "objective, specific, and articulable facts from which an experienced officer would suspect that a citizen is in need of help." *Lovegren*, ¶ 25. The officers responded to a report of a potentially intoxicated, suicidal male in possession of a firearm that had possibly been discharged in

his home. When the officers arrived, they peered through Case's windows to look for evidence of injury. The officers could see empty beer cans, an empty holster, and a notepad. All signs were consistent with their impression that Case was suicidal and potentially intoxicated, which was further corroborated by J.H.'s description of her phone call with Case. The officers were aware of Case's history with law enforcement, suicidal episodes, and alcohol abuse; thus, they took a cautious view of the situation prior to carrying out Sather's order to enter Case's home. The officers were likewise aware that, while on the phone with J.H., Case referenced a "note" and potentially discharged a firearm. An experienced officer would similarly assess present circumstances, reconcile them with prior knowledge of the individual, and formulate a plan to render aid accordingly.

¶39 Further, the actions the officers took were appropriate for mitigating peril. The officers were aware of the likelihood a firearm was on the premises, given J.H.'s report and the empty holster. The officers repeatedly announced their presence before and after entering the home, shouting that they were only there to help. Case never responded. There is no indication that the officers' entry and subsequent walk through the premises exceeded what was necessary to ensure their own safety and establish Case's wellbeing. After weighing the inherent risk of the situation against their caretaker obligations, the officers appropriately swept Case's home with firearms drawn.

¶40 Immediately after Pasha shot Case, the officers began taking actions that "would constitute a seizure implicating the Fourth Amendment and Article II, Section 11, of the Montana Constitution." *Lovegren*, ¶ 25. The officers' presence in the home thus

14

"morphed" from a welfare check to an arrest, for which probable cause would ordinarily be required. *Nelson*, ¶ 6; U.S. Const. amend. IV; Mont. Const. art. II, §§ 10, 11. "[P]robable cause is established if the facts and circumstances within an officer's personal knowledge, or related to the officer by a reliable source, are sufficient to warrant a reasonable person to believe that another person is committing or has committed an offense." *State v. Williamson*, 1998 MT 199, ¶ 21, 290 Mont. 321, 965 P.2d 231. The jury unanimously decided that Case "knowingly or purposefully caused reasonable apprehension of serious bodily injury in Sgt. Richard Pasha when he pointed a pistol, or what reasonably appeared to be a pistol, at Sgt. Richard Pasha." Before the welfare check morphed into an arrest, Case had thus assaulted Pasha, and probable cause had accordingly ripened for an arrest.

¶41 Reflecting the uniqueness of the circumstances here—and the narrowness of the exception—we have only applied the caretaker doctrine to the warrantless entry of a home on one other occasion.[6] *Frazier* involved a welfare check on a suicidal individual's home that culminated in his death. Our decision recounted the following details:

> Miller and Roselles arrived at the house with their patrol car's lights off. In order to ensure their own safety and preliminarily assess the situation, the officers each patrolled around one side of the house. Because all the shades were drawn, however, the officers were not able to gather any additional information. Officer Roselles finished checking his section of the perimeter first. He stepped onto the front porch and knocked on the door several times,

---

[6] We have applied the exigent circumstances exception to cases involving the warrantless entry of a domicile (upon probable cause of criminal conduct) on numerous occasions. *See generally Wakeford* (citing *State v. Sorenson*, 180 Mont. 269, 590 P.2d 136 (1979)); *see also State v. Smith*, 2021 MT 324, ¶ 24, 407 Mont. 18, 501 P.3d 398 (citing *State v. Saale*, 2009 MT 95, ¶ 10, 350 Mont. 64, 204 P.3d 1220). We have also analyzed warrantless searches and seizures of vehicles under the community caretaker doctrine. *See generally Lovegren; Nelson; Stone*.

15

to no response. At about this time, Officer Miller joined Officer Roselles on the porch by the front door. Officer Roselles then turned the doorknob and opened the front door a few inches. At this point, Frazier responded, yelling at the officers that they did not have the right to be there, to close the door, and to get out of the house and go away. Frazier also stated that he was "fine." Neither officer could see Frazier at this point—only hear him. Officer Roselles backed off the front porch and called dispatch, attempting to obtain additional information that might justify a warrantless entry or the phone number for Frazier's parents, so that he might obtain consent to enter the house. Dispatch could not provide him with either.

.  .  .

By the time Officer Roselles finished his call, Officer Miller had pushed the front door fully open; in doing so, his hand reached inside Frazier's home. At the time he pushed the door open, Miller still could not see Frazier. At this point, Officer Roselles turned on his body-camera and took a position slightly behind Officer Miller by the front door. Frazier then quickly stepped in front of the doorway, holding a pistol to his own head; in response, Officer Miller immediately drew and presented his service pistol. Still holding his pistol to his head, Frazier repeatedly begged the officers to shoot him. Officer Miller attempted to de-escalate the situation and told Frazier to put his gun down, but Frazier ignored his requests and continued to ask the officers to shoot him. While Officer Miller was still attempting to calm the situation, Frazier moved his gun's barrel away from his head and toward Officer Miller stating, "Suicide by cop, I know all about it." Officer Miller then fired three rounds from his pistol, all striking Frazier, who collapsed to the floor. The officers attempted first aid, to no avail.

*Frazier*, ¶¶ 5-6. Frazier's estate sued the State, alleging assault, wrongful death, negligence by Miller, and a violation of Frazier's rights under the Montana Constitution. *Frazier*, ¶ 7. Applying the community caretaker doctrine, we determined the officers' entry was constitutionally permissible, and that "it would have been 'a dereliction of [duty]' had the officers ignored Frazier's call or simply walked away when he called out that he was 'fine.'" *Frazier*, ¶ 25 (citing *Lovegren*, ¶ 26).

¶42　Although the entry here did not result in Case's death, the basis for Sather's decision to enter Case's home is analogous to *Frazier*. "The officers here were responding to a threat of imminent suicide, a non-criminal but imminently perilous situation in which immediate action is often necessary." *Frazier*, ¶ 23. Although the officers in *Frazier* ultimately did not enter the home other than to push the front door open, that was only because Frazier responded to their presence and they did not need to sweep the home. The officers' decision to do so here was calculated, and it was appropriate to mitigate the risk of Case's suicide or potential injury.

¶43　The District Court did not err when it denied Case's motion to suppress evidence obtained pursuant to a warrantless entry.

¶44　*Issue Two:　Did the District Court abuse its discretion in denying Case a new trial based on an alleged* Brady *violation?*

¶45　Case argues the District Court should have granted him a new trial because the State failed to disclose potentially exculpatory evidence that Pasha had been shot at on another case, roughly three months before his entry into Case's home. The State counters that this argument was not properly raised below, thus the District Court acted within its discretion to deny Case a new trial. The State argues further that Case cannot meet his burden to show a *Brady* violation occurred, and it should therefore be denied even if we consider its merits on appeal. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

¶46　Criminal defendants have a due process right to discover exculpatory evidence. *Brady,* 373 U.S. at 87, 83 S. Ct. at 1196-97. Exculpatory evidence includes evidence that is favorable to the accused and material either to guilt or to punishment. *State v. Stutzman*,

17

2017 MT 169, ¶ 28, 388 Mont. 133, 398 P.3d 265 (citation omitted). "To prove a due process violation under *Brady*, a defendant must show: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different." *Ilk*, ¶ 29.

¶47 We disagree with the State that this issue was not properly preserved for appeal. While Case did not raise the *Brady* issue until he filed the reply brief to his motion for a new trial, the State and the District Court were given an opportunity to address it. On January 30, 2023, the State briefed its response to Case's *Brady* arguments in State's Response to Defendant's New Issues in Reply Brief in Support of Motion for a New Trial. On February 9, 2023, the District Court ruled against Case on the issue in its Order Denying Motion for New Trial.

¶48 While a "reply brief must be confined to new matters raised in the brief of the appellee[,]" the principles underlying the "raise or waive rule" aim to ensure fairness to parties, ensuring each has "an opportunity to respond to [new matters] factually." M. R. App. P. 12(3); *State v. West*, 2008 MT 338, ¶ 17, 346 Mont. 244, 194 P.3d 683 (citations omitted). Despite Case's procedural missteps, the State had an opportunity to respond here.

¶49 Regardless of any procedural issues, we prefer to resolve cases on their merits. *In re Estate of Mills*, 2015 MT 245, ¶ 12, 380 Mont. 426, 354 P.3d 1271 (citation omitted).

18

¶50 Case has not met his burden to show that a *Brady* violation has occurred. The outcome of the proceedings would not have been different if the State had disclosed evidence about the timing of Pasha's prior incident. *Ilk*, ¶ 29.[7]

¶51 Case asserts that "Even though the individual officers [sic] mental state isn't the standard, it is a factor considered by the jury." Case argues that evidence specifically about when Pasha was shot at might have led the jury to conclude that Pasha was apprehensive before he stepped into Case's home, that he shot at "movement" rather than "an identified individual possessing what the officer reasonably believes to be a weapon," and that element of the crime thus logically could not have been satisfied.

¶52 The jury was tasked with determining whether Case "purposely or knowingly caus[ed] reasonable apprehension of serious bodily injury in a peace officer by use of a weapon or what reasonably appear[ed] to that peace officer to be a weapon." The "reasonable person" standard is objective. *State v. Michelotti*, 2018 MT 158, ¶ 27, 392 Mont. 33, 420 P.3d 1020 (citation omitted). Pasha's personal experiences have no bearing on whether his apprehension of fear, or perception that Case possessed what appeared to be a weapon, was objectively reasonable. If the jury were instructed to apply a standard incorporating individualized elements, like Pasha's individual experiences, it would be subjective and inconsistent with the law. *Michelotti*, ¶ 27.

---

[7] During Case's December 5, 2022 jury trial, Pasha testified: "I was recently involved in a case not too long prior to this where I was shot at."

¶53    The District Court did not err when it determined a *Brady* violation did not occur, therefore it did not abuse its discretion in denying Case a new trial.[8]

**CONCLUSION**

¶54    The District Court properly denied Case's motion to suppress evidence obtained after officers responding to his threat of suicide entered his home without a warrant.  The officers acted in accord with their caretaker obligations when they entered Case's home, and they acted upon probable cause that Case had assaulted Pasha when they detained him.  Likewise, the District Court did not abuse its discretion in denying Case a new trial.  Case failed to demonstrate that the outcome would have been different had evidence that Pasha was shot at three months prior been introduced by the State.

¶55    Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

---

[8] We decline to separately address the merits of Case's argument that there was insufficient evidence to support his conviction of assault on a peace officer.  Viewing the evidence in the light most favorable to the prosecution, Pasha's testimony regarding the "dark object," coupled with the actual presence of a handgun, was sufficient to support the conviction.  *State v. Kirn*, 2012 MT 69, ¶ 10, 364 Mont. 356, 274 P.3d 746 (citation omitted); *see also State v. Steele*, 2004 MT 275, ¶ 33, 323 Mont. 204, 211, 99 P.3d 210 ("A person need not actually see a weapon to feel threatened by use of that weapon.").

20

Justice Laurie McKinnon dissenting.

¶56    I dissent. I think the Court's analysis is confusing and unnecessary. Our case law already establishes a framework for law enforcement to address situations as here. I would analyze these facts to determine whether there was probable cause to believe Case was subject to imminent harm, distress, or in need of assistance and assess the presence of exigent circumstances. In my opinion, the probable cause requirement under the exigency exception is not limited to only the commission of a criminal offense but applies to whether there is probable cause to believe a person is in imminent peril and in need of help. It is a standard law enforcement is trained to assess. For a warrantless search to be reasonable, probable cause must remain a necessary component in the analysis. The Court incorrectly extends the community caretaker doctrine, which derives from law enforcement's interactions with pedestrians and vehicles, to the warrantless entry of a home. In doing so, the Court misapprehends *Caniglia,* which held that the community caretaker doctrine was *not* a standalone exception to the warrant requirement and did not permit warrantless entries into personal residences. Finally, after applying the appropriate analytical framework, I would conclude there was not sufficient probable cause or exigent circumstances which would justify the warrantless entry into Case's home.

¶57    The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution protect the right of the people to be secure in their persons, homes, and effects against unreasonable searches and seizures. The "very core" of this guarantee is the right of a person to retreat into their home and within the sanctity of that

21

home be free from unreasonable governmental intrusion. *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, (2013). Warrants issued upon probable cause prior to a search by law enforcement satisfy the reasonableness requirement and safeguard the sanctity of the home against arbitrary invasions by governmental officials. "The home is the most sanctified of all 'particular places'" referred to in the Fourth Amendment and Article 11, *State v. Graham*, 2004 MT 385, ¶ 22, 325 Mont. 110, 103 P.3d 1073, and "it is for that reason that the exceptions to the warrant requirement are, concomitantly, jealously guarded and carefully drawn," *State v. Ellis*, 2009 MT 192, ¶ 73, 351 Mont. 95, 210 P. 3d 144. These exceptions include: (1) consent, freely and voluntarily given, *State v. Bieber*, 2007 MT 262, ¶ 29, 339 Mont. 309, 170 P.3d 444; (2) a search incident to a lawful arrest, *State v. Hardaway*, 2001 MT 252, ¶ 24, 307 Mont. 139, 36 P.3d 900 (citing § 46-5-102, MCA); and (3) exigent circumstances coupled with probable cause, *State v. Stone*, 2004 MT 151, ¶ 18, 321 Mont. 489, 92 P. 3d 1178. *Ellis*, ¶ 73.

¶58    The community caretaker doctrine is not an exception to the warrant requirement. *Caniglia*, 593 U.S. at 194. 144 S. Ct. at 1596. In *Lovegren* we noted several "categories" of "police-citizen encounters" and observed some do "not involve any form of detention at all and, therefore, does not involve a seizure." *State v. Lovegren*, 2002 MT 153, ¶¶ 13-16, 310 Mont. 358, 51 P.3d 471. In this Court's first recognition of the community caretaker doctrine within the context of a vehicle encounter, we drew from *Cady*, which explained the justification for the doctrine:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or

22

involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528. The Supreme Court recently expressed that while *Cady* involved a warrantless search of a firearm, "the location of that search was an impounded vehicle–not a home–'a constitutional difference' that the [*Cady* Court] "repeatedly stressed." *Caniglia*, 593 U.S. at 197, 141 S. Ct. at 1599. "In fact, Cady expressly contrasted its treatment of a vehicle already under police control with a search of a car 'parked adjacent to the dwelling place of the owner." *Caniglia*, 593 U.S. at 199, 141 S. Ct. at 1599, quoting *Cady*, 413 U.S. at 446-448. Thus, the Court held the distinction between vehicles and homes places the community caretaker doctrine in the proper context and that recognition these tasks for officers exists is "not an open-ended license to perform them anywhere." *Caniglia*, 593 U.S. at 199,141 S. Ct. at 1600.

¶59 The Court gives no effect to *Caniglia*, which grants greater Fourth Amendment protections than the Court's decision today. In fact, the Court misguidedly attributes the "premise" of my position that the community caretaker doctrine is not an exception to the warrant requirement to *Lovegren*. Opinion, ¶ 25 n.1. However, *Lovegren* said nothing about the community caretaker doctrine in the context of a home. *Lovegren* identified

23

different categories of encounters and recognized some did not involve any detention at all. *Lovegren*, ¶ 16.

¶60 Prior to the Court's decision in *Caniglia*, this Court applied the *Lovegren* community caretaker doctrine to hold the warrantless entry into the home of a suicidal person was justified and, like "plain view and exigent circumstances," was an exception to the warrant requirement. *Frazier*, ¶ 28. While in *Frazier* there clearly was probable cause to believe Frazier was suicidal and there were present exigent circumstances justifying a warrantless entry, our reasoning was inconsistent with what *Caniglia* subsequently held. Here, rather than draw consistently from *Caniglia*, the Court extends the community caretaker doctrine to circumstances specifically disavowed by the Supreme Court: "The question today is whether *Cady*'s acknowledgment of these 'caretaking' duties creates a standalone doctrine that justifies warrantless searches and seizures in the home. It does not." *Caniglia*, 593 U.S. at 196, 144 S. Ct. at 1596.

¶61 The only exception to the warrant requirement applicable here is whether there were exigent circumstances present and probable cause to believe a person is in danger. "Exigent circumstances for conducting a warrantless search exist 'where it is not practicable to secure a warrant.'" *State v. Bassett*, 1999 MT 109, ¶ 47, 294 Mont. 327, 982 P.2d 410. We have defined "exigent circumstances" as those circumstances that "would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly

24

frustrating legitimate law enforcement efforts." *State v. Gomez*, 2007 MT 111, ¶ 24, 337 Mont. 219, 158 P. 3d 442.

¶62 In my opinion, the record does not support the presence of exigent circumstances. Upon arrival, and after looking through the windows, officers saw a notebook with a handwritten entry they could not read, but assumed it was a suicide note. They also observed through the windows an open beer can and a holster. While conferring about how to proceed, Sergeant Pasha stated, "if we go in there, we gotta be careful man, just in case he didn't actually shoot himself" and then admitted Case might not be in immediate need of aid, by stating "I'm scared that maybe he didn't actual shoot himself, because he can't and he's tried suicide by cop before, and he like left us all this so we're gonna go in the house and . . . he is going to pull a gun on us." All the officers on the scene stated that it was unlikely Case required immediate aid, but rather was likely lying in wait for them to commit suicide by cop. Here the officers arrived at a vacant and silent residence with no signs of an active emergency in progress. They were not responding to a call from Case himself requesting immediate assistance. More telling as to the lack of exigency, the officers waited nearly an hour before making entry. In contrast to *Fisher,* where the officers observed a man screaming and throwing things through a window from the outside, the officers here made no observations of Case. In contrast to *Snipe*, where the door had been left open, the officers here entered through a closed and latched door. In every case involving exigent circumstances, the response from law enforcement was expedited and

not delayed. I would conclude that the State has not met its burden of demonstrating the presence of exigent circumstances.

¶63 The Ninth Circuit in *Snipe*, recognizing the requirement of both probable cause and exigency, held that "both the Second and Eleventh Circuits h[ave] held that '"in an emergency, the *probable cause* element may be satisfied where officers reasonably believe a person is in danger.'" *United States v. Snipe*, 515 F.3d, 947 at 952 (emphasis supplied). *See United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002); *Koch v. Brattleboro*, 287 F.3d 162, 169 (2d Cir. 2002). In fact, the court in *Snipe*, explaining the Supreme Court's decision in *Brigham City v. Stuart*, 547 U.S. 398, 126 S. Ct. 1943, (2006), held "the [Supreme Court] assumed that *probable cause* to associate the emergency with the place to be searched exits whenever law enforcement officers have an objectively reasonable basis for concluding that an emergency is unfolding in that Place." *Snipe*, 515 F.3d at 951 (emphasis supplied). The Court reasons that, because probable cause pertains only to criminal matters, the requirement of probable cause to believe a person is in peril coupled with exigent circumstances is an "unprecedented formulation of the law," Opinion, ¶ 35. But this position is starkly contrary to both the Supreme Court's recent holding in *Caniglia* and ample other precedent. Probable cause is not limited to assessing the likelihood a criminal offense has been or is being committed—it is the touchstone for inquiries under both the federal and Montana Constitution of whether the warrantless entry into a person's home is reasonable. There is nothing novel about requiring probable cause before police may enter a person's home without a warrant.

26

¶64     I would conclude that there was no probable cause to believe Case was in imminent peril and in need of immediate assistance. This Court has addressed facts that establish the reasonableness of a warrantless entry into the home and probable cause to believe there was an emergency. In *State v. Loh*, 275 Mont. 460, 474, 914 P. 2d 592, 601 (1996), we concluded officers' warrantless entry into Loh's home was lawful given that they responded to a home that was engulfed in smoke and were told at the scene there were possibly two more people inside the home. We explained, quoting *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1950, (1978):

> A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry "reasonable." Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out a blaze. And once in a building for this purpose, firefighters may seize evidence of arson that is in plain view.

Loh, 275 Mont. at 474, 914 P.2d at 592. Similarly, we concluded in *State v. Lewis*, 2007 MT 295, ¶¶ 20-21, 28-29, 340 Mont. 10, 171 P.3d 731, that the warrantless entry of officers "prompted by the exigent circumstances of a fire, was lawful."

¶65     The probable cause here came from an ex-girlfriend who was arguing with Case over the phone when Case ended the call. The ex-girlfriend called the police to report that he "was threatening suicide and the phone just went silent, and she didn't get a response;" and that "he said he had a loaded gun, and all I hear was clicking and, I don't know, I thought I heard a pop at the end, I don't know." The request for law enforcement assistance came, not from the person needing assistance, but from an ex-girlfriend. While law

27

enforcement was required to follow-up on this information, the information did not give them an open-ended license to enter a home without a warrant.

¶66 The Court extends the *Lovegren* community caretaker doctrine to a warrantless home entry, a situation specifically disavowed by the Court in *Caniglia*. It applies an awkward test not consistent with Montana's heightened right of privacy and establishes a *new* exception to the warrant requirement based on an "objectively reasonable basis." This new exception improperly extends the *Lovegren* doctrine, a doctrine based on *Terry* and particularized or reasonable suspicion, to the warrantless entry of a home. It relieves law enforcement of their obligation to assess the presence of probable cause to believe a warrantless entry is required to address an emergency within the home and, in its place, issues law enforcement an open-ended license to enter a home upon a mere reasonable suspicion. The only relevant exception to the warrant requirement requires an exigency and probable cause, which the Court obfuscates completely in its analysis. Further, the Court finds the presence of exigent circumstances on bare bone circumstances—where assistance was not requested by Case and when no officer observed any signs of an emergency, even after being there for nearly an hour. After applying the standard of probable cause to the determination of whether an emergency exists which requires immediate police action to prevent imminent harm, injury, or distress, I would conclude there was no probable cause for an emergency. In my opinion, a warrantless entry into a home based on a call from an ex-girlfriend that she "thought" she heard a "pop," is

28

insufficient.  The only true exception to the warrant requirement relevant here, is the presence of exigent circumstances and probable cause.  I would find neither present here.

/S/ LAURIE McKINNON

Justice Ingrid Gustafson and Justice Dirk Sandefur join in the Dissent of Justice McKinnon.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR