(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CASE *v.* MONTANA

### CERTIORARI TO THE SUPREME COURT OF MONTANA

No. 24–624. Argued October 15, 2025—Decided January 14, 2026

In *Brigham City* v. *Stuart*, 547 U. S. 398, 400, the Court held that the Fourth Amendment allows police officers to enter a home without a warrant if they have an "objectively reasonable basis for believing" that someone inside needs emergency assistance. In this case, Montana police officers responded to the home of petitioner William Case after his ex-girlfriend called 9–1–1 to report that he was threatening suicide and may have shot himself. The officers knocked on the doors and yelled into an open window, but got no response. They could see an empty handgun holster and something that looked like a suicide note inside, and they ultimately decided to enter the home to render emergency aid. When one officer approached a bedroom closet in which Case was hiding, Case threw open the closet curtain while holding an object that looked like a gun. Fearing that he was about to be shot, the officer shot and injured Case. An ambulance was called to take Case to the hospital, and officers found a handgun next to where Case had stood.

Case was charged with assaulting a police officer. Case moved to suppress all evidence obtained from the home entry, arguing that the police violated the Fourth Amendment by entering without a warrant. The trial court denied the motion, and a jury found Case guilty. A divided Montana Supreme Court upheld the officers' entry as lawful under Montana's caretaker doctrine, rejecting the contention that an officer must have probable cause to believe that an occupant needs emergency aid.

*Held*: *Brigham City*'s objective reasonableness standard for warrantless home entries to render emergency aid applies without further gloss and was satisfied in this case. Pp. 5–11.

Syllabus

(a) "[S]earches and seizures inside a home without a warrant are presumptively unreasonable" under the Fourth Amendment. *Brigham City*, 547 U. S., at 403. But the "warrant requirement is subject to certain exceptions," *Lange* v. *California*, 594 U. S. 295, 301, including the need to render emergency assistance. The Court first approved a warrantless home entry to render emergency assistance in *Brigham City*, holding that officers may enter when they have "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." 547 U. S., at 400.

The Montana Supreme Court's opinion below strayed from that rule. Most important, the emergency-aid test incorporated in Montana's caretaker doctrine evokes the Fourth Amendment standard of "reasonable suspicion" that applies to relatively non-invasive street stops. But *Brigham City* adopted a different standard for home entries.

Case now urges the Court to understand *Brigham City* as sounding in probable cause, but the Court declines to put a new probable-cause spin onto the emergency-aid standard. Probable cause is "peculiarly related to criminal investigations," *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 667, and that body of law would fit awkwardly, if at all, in the non-criminal, non-investigatory setting at issue here. Rather than strain to relate probable-cause decisions to emergency-aid situations, *Brigham City* asked simply whether an officer had "an objectively reasonable basis for believing" that entry was direly needed to prevent or deal with serious harm. 547 U. S., at 400. Courts should assess the reasonableness of an emergency-aid entry on its own terms, rather than through the lens generally used to consider investigative activity. Pp. 5–9.

(b) The officers here had an "objectively reasonable basis for believing" that their entry was needed to prevent Case from ending his life. The information the officers obtained from Case's ex-girlfriend, combined with their observations at the scene, suggested that Case may already have shot himself or would do so absent intervention. The officers' decision to enter his home to prevent that result was reasonable. Accordingly, the Court affirms the judgment (even though not all the reasoning) of the Montana Supreme Court. Pp. 9–11.

417 Mont. 354, 553 P. 3d 985, affirmed.

KAGAN, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., and GORSUCH, J., filed concurring opinions.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–624

WILLIAM TREVOR CASE, PETITIONER *v.* MONTANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MONTANA

[January 14, 2026]

JUSTICE KAGAN delivered the opinion of the Court.

In *Brigham City* v. *Stuart*, 547 U. S. 398, 400 (2006), this Court held that police officers may enter a home without a warrant if they have an "objectively reasonable basis for believing" that someone inside needs emergency assistance. The question presented is whether that standard means that officers must have "probable cause" for the intrusion, as they typically would when investigating a crime. We hold it does not. The probable-cause requirement is rooted in, and derives its meaning from, the criminal context, and we decline to transplant it to this different one. *Brigham City*'s reasonableness standard means just what it says, with no further gloss. And here it was satisfied because the police had "an objectively reasonable basis for believing" that a homeowner intended to take his own life and, indeed, may already have shot himself.

## I

This case began with an alarming phone call—from petitioner William Case to his ex-girlfriend J. H., both residents of a small town in Montana. Case told J. H. on the call that "he was going to kill himself." App. 67 (testimony of J. H.). Because Case sounded "erratic," J. H. assumed he had been

drinking. *Ibid.* She tried to talk Case out of committing suicide, but "couldn't reel him back": With each passing moment, Case "became more methodical about what he was going to do." *Id.*, at 68. Case said that he was "going to get a note"—presumably meaning a suicide note, for J. H. or others to find. *Ibid.* And then J. H. heard a "clicking" sound, like the "cock[ing of] a gun." *Ibid.* J. H. told Case she was going to call the police, but that seemed only to antagonize him: Case replied "he would shoot them all too." *Id.*, at 69. Finally, J. H. heard "a pop" followed by "nothing"—"just dead air." *Ibid.* She "yelled [Case's] name a few times," but got no response, leading her to think he had "pulled the trigger." *Ibid.* So she called 9–1–1 to report the incident and drove as fast as she could to Case's home.

Three police officers, dispatched to do "a welfare check on a suicidal male," met J. H. outside the house. *Id.*, at 104 (testimony of officer). They decided the situation was "very serious," based both on what J. H. told them about the call and on what they already knew about Case. *Id.*, at 75, 157. The officers were aware that Case had a history of alcohol abuse and mental-health issues; that he had previously threatened suicide at the school where he worked; and that he had once seemed to attempt "suicide-by-cop," by confronting the police in a way that was likely to provoke a lethal response. So the three officers requested that the chief of police come to the scene. While waiting for him, they circled the house looking for signs of injury or danger. They knocked on the doors and yelled into an open window, but got no response. Shining their flashlights inside, they could make out empty beer cans, an empty handgun holster, and a notepad with writing on it, which they took to be the suicide note Case had mentioned to J. H. At that point, however, they saw no sign of Case.

Once the chief came, the officers conferred and decided to enter the house "to render emergency aid." *Id.*, at 198. In the best-case scenario, they hoped to "talk [Case] down" and

prevent any injury. *Id.*, at 174. But given J. H.'s account, the officers considered as well another possibility—that Case had already shot himself and might be "in there bleeding." *Id.*, at 85. At the same time, they worried that if Case remained unharmed, their entry could spark a confrontation. See *id.*, at 174, 192–193. So they equipped themselves with long-barrel guns and a ballistic shield before going in.

The officers entered the house through the front door, about 40 minutes after they first arrived. They announced themselves loudly, and continued to call out as they walked through the home. Case did not answer; he was hiding in the closet of a bedroom upstairs. When one of the officers entered that room, Case threw open the closet curtain and appeared from behind it, holding "a black object" which looked like a gun. *Id.*, at 194. Fearing that he was about to be shot, the officer fired his own rifle. The bullet hit Case in the abdomen, and another officer rushed to administer first aid. An ambulance was called to take Case to the nearest hospital (where he recovered). Meanwhile, one of the officers found a handgun in a laundry basket next to the place where Case had stood.

The county attorney charged Case with assaulting a police officer. Case moved to suppress all evidence obtained as a result of the home entry, arguing that the police had violated the Fourth Amendment by coming into his house without a warrant. The trial court denied the motion on the ground that the police officers were responding legitimately to an "emergency." App. to Pet. for Cert. 42a. A Montana jury then found Case guilty of the crime charged.

On appeal, a divided Montana Supreme Court upheld the trial court's ruling that the officers' entry was lawful. The majority analyzed the issue under its "community caretaker doctrine." 553 P. 3d 985, 990 (Mont. 2024). It noted that a recent Fourth Amendment decision of this Court, *Caniglia* v. *Strom*, 593 U. S. 194, 198 (2021), had rejected a "community caretaking rule" allowing a warrantless home

entry even absent a "need to render emergency assistance" to an occupant. But the Montana court thought its community-caretaker doctrine survived that holding because it demanded such an emergency. Under that doctrine, the court explained, police could enter a home to do a "welfare check" only when "objective, specific and articulable facts" would lead an "experienced officer [to] suspect" that a person inside "is in need of help or is in peril." 553 P. 3d, at 990, 991. And the court found that facts meeting that description existed here because of the likelihood of suicide. See *id.*, at 994. The court rejected Case's alternative standard: that a police officer must have "probable cause to believe" the occupant in need of emergency aid. *Id.*, at 992. The "probable cause" locution, the court suggested, applies only when the police are "engaged in a criminal investigation." *Ibid.* The dissenting justices, by contrast, favored the proposed probable-cause rule, which they concluded the officers here did not satisfy. See *id.*, at 996, 998 (opinion of McKinnon, J.). In the dissent's view, the court's different approach resembled the "mere reasonable suspicion" standard applicable to comparatively non-invasive street stops. *Id.*, at 999. That standard, the dissent thought, was too easily met to support a warrantless entry into a home. See *id.*, at 996, 999.

We granted certiorari, 605 U. S. 968 (2025), because courts have differed on whether police officers entering a home to provide emergency aid need "probable cause" to believe that an occupant is in peril.* We conclude that standard, borrowed from the criminal context, is inapt. We instead hold just what we have held before: that the officers

————————

*Compare, *e.g.*, *Estate of Chamberlain* v. *White Plains*, 960 F. 3d 100, 105 (CA2 2020) (requiring probable cause); *United States* v. *Cooks*, 920 F. 3d 735, 742 (CA11 2019) (same); *Corrigan* v. *District of Columbia*, 841 F. 3d 1022, 1030 (CADC 2016) (same), with, *e.g.*, *Hill* v. *Walsh*, 884 F. 3d 16, 23 (CA1 2018) (not requiring probable cause); *United States* v. *Quarterman*, 877 F. 3d 794, 800 (CA8 2017) (same); *United States* v. *Gambino-Zavala*, 539 F. 3d 1221, 1225 (CA10 2008) (same).

may enter if, but only if, they have an "objectively reasonable basis for believing" that an occupant faces serious danger. *Brigham City*, 547 U. S., at 400.

## II

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." At the "very core" of that guarantee, as this Court has often stated, "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia*, 593 U. S., at 198 (quoting *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013)). When the intrusion is into that most private place, "reasonableness" usually means having a warrant. *Brigham City*, 547 U. S., at 403 ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable"). "But not always: The warrant requirement is subject to certain exceptions." *Lange* v. *California*, 594 U. S. 295, 301 (2021). And among those is one pertinent here, involving the need to provide an occupant with emergency aid.

This Court first approved a warrantless home entry to render emergency assistance in *Brigham City*. There, police officers responding to a noise complaint observed through a kitchen window a physical altercation between an adolescent and several adults. As they watched, the teenager punched one of the adults in the face, "sending [him] to the sink spitting blood." 547 U. S., at 406. The officers immediately entered the home through a nearby screen door and, announcing their presence, caused the fight to cease. We unanimously approved the warrantless entry as "reasonable under the circumstances." *Ibid.* And we explained what made it so: The officers had "an objectively reasonable basis for believing that an occupant [was]

seriously injured or imminently threatened with such in-
jury." *Id.*, at 400.

Three years later, in *Michigan* v. *Fisher*, we reiterated
what we had said in *Brigham City* about the "emergency
aid exception." 558 U. S. 45, 47 (2009) (*per curiam*). The
police in *Fisher*, also responding to a neighbor's report,
found a scene redolent of violence and danger. Three win-
dows were broken, with the glass strewn on the ground out-
side; blood was smeared on one of the doors, as well as on
the smashed-in hood of a pickup truck in the driveway; and,
visible through a window, a man inside the house was
"screaming and throwing things" at an unseen target. *Id.*,
at 48. We held that the officers' entry in those circum-
stances was "reasonable under the Fourth Amendment,"
just as it had been in *Brigham City*. 558 U. S., at 48. Using
the same standard articulated there, we concluded that the
officers had "an objectively reasonable basis for believing"
that an occupant of the home needed immediate aid. *Id.*, at
47 (quoting *Brigham City*, 547 U. S., at 406).

Finally, in *Caniglia*, we reaffirmed *Brigham City* even as
we rejected a broader "community caretaking" justification
for warrantless home entries. The police had gone to Ed-
ward Caniglia's home after his wife reported that he was
suicidal. Caniglia spoke with the officers on his front porch
and agreed to go to a hospital for psychiatric testing. Then,
once he had left, the officers went inside and took away two
handguns he owned. The lower courts approved the entry
on the ground that the officers were performing "commu-
nity caretaking functions." 593 U. S., at 196. But we de-
clined to recognize such an "open-ended license" for law en-
forcement officers to enter private homes. *Id.*, at 199.
Citing *Brigham City*, we readily acknowledged that officers
may enter a home to "render emergency assistance to an
injured occupant or to protect an occupant from imminent
injury." 593 U. S., at 198. But such emergency conditions

were indeed necessary and, given the facts, the officers had never tried to defend their entry on that basis.

The Montana Supreme Court's opinion strayed from the Fourth Amendment rule that trio of decisions sets out. To begin with, the court's use of "community caretaker" doctrine was ill-advised, given that *Caniglia* contrasted "community caretaking" with "render[ing] emergency assistance" and concluded that the former cannot alone justify a warrantless home entry. *Ibid.* The Montana court, to be sure, tried to reconcile its approach with *Caniglia* by depicting its community-caretaker rule as allowing home entries only in emergencies. See 553 P. 3d, at 991. But using terminology that this Court has held misplaced in home-entry cases could serve only to confuse the issue. And yet more fundamental, the emergency-aid test incorporated in Montana's caretaker doctrine is different from the one adopted in *Brigham City*. As noted above, Montana's test finds a home entry "reasonable" when an officer has "specific and articulable facts" from which to "suspect" that someone needs help. 553 P. 3d, at 991; see *supra*, at 4. That test's language, as the dissenting justices noted, evokes the Fourth Amendment standard applying to brief, investigative street stops: "reasonable suspicion" based on "specific and articulable facts." *United States* v. *Sokolow*, 490 U. S. 1, 7 (1989); *Terry* v. *Ohio*, 392 U. S. 1, 21 (1968); 553 P. 3d, at 999 (McKinnon, J.). But *Brigham City* did not adopt *Terry*'s reasonable-suspicion standard for home entries, as both the State of Montana and the United States as *amicus curiae* acknowledge. See Tr. of Oral Arg. 56, 68–69, 80. Rather, *Brigham City* formulated its own standard for dealing with household emergencies—again, whether an officer has "an objectively reasonable basis for believing" that an occupant is seriously injured or imminently threatened with such harm. 547 U. S., at 400.

Case, however, wants something more. He recognizes that the *Brigham City* test applies here, and that it has had

but one formulation: In describing and applying that standard, we have never used any different terms. See Brief for Case 24. But still, Case urges us now to understand the *Brigham City* test as "sound[ing] in probable cause." Brief for Case 15, 24. What the test really requires, Case contends, is that police officers "have probable cause to believe [an occupant is] seriously injured or imminently threatened with such injury." *Id.*, at 2. Case reaches that conclusion based mainly on the Fourth Amendment's recognition of the "sanctity of the home." *Id.*, at 29. Given that special status, he argues, a home entry's aid-giving, "noninvestigatory purpose" should make no difference: The same probable-cause principles used in deciding whether "criminal activity [is] afoot" should apply as well in "assessing the risk and gravity of an emergency." Reply Brief 1–2, 8, 16.

We decline Case's invitation to put a new probable-cause spin onto *Brigham City*. "[T]he probable-cause standard," this Court has often stated, "is peculiarly related to criminal investigations." *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 667 (1989) (quoting *Colorado* v. *Bertine*, 479 U. S. 367, 371 (1987)). The standard's history is "rooted" in the "criminal investigatory context." *O'Connor* v. *Ortega*, 480 U. S. 709, 723 (1987) (plurality opinion); see *Henry* v. *United States*, 361 U. S. 98, 100–102 (1959). And the standard has acquired meaning over time by virtue of that context, as judges have assessed, in case after case, the requisite likelihood of finding criminal contraband or evidence. See, *e.g.*, *Illinois* v. *Gates*, 462 U. S. 213, 238–239 (1983). The resulting body of law would fit awkwardly, if at all, in the non-criminal, non-investigatory setting at issue here. So *Brigham City* adopted a different approach. Rather than strain to relate probable-cause decisions to emergency-aid situations, we asked simply whether an officer had "an objectively reasonable basis for believing" that his entry was direly needed to prevent or deal with serious harm. 547 U. S., at 400. In adhering to that question, we respect as

ever the "first among equals" status the Fourth Amendment affords the home. *Jardines*, 569 U. S., at 6; see *Caniglia*, 593 U. S., at 198–199. And in that vein, we note that an emergency-aid entry provides no basis to search the premises beyond what is reasonably needed to deal with the emergency while maintaining the officers' safety. But we assess the reasonableness of that limited entry on its own terms, rather than through the lens generally used to consider investigative activity.

Doing so here yields a ready conclusion: The officers had, as *Brigham City* requires, an "objectively reasonable basis for believing" that their intervention was needed to prevent serious harm. As earlier described, the officers knew first-hand that Case suffered from mental-health and alcohol-abuse problems, and that he had previously talked about committing suicide. See *supra*, at 2. When they reached Case's house, they learned about J. H. and Case's just-concluded phone call—that Case, in an apparently inebriated state, threatened to kill himself, spoke of preparing a suicide note, and quite possibly cocked or even shot a gun before the line went dead. The concerns that call raised were heightened by what the officers could see through the windows—empty beer cans, an empty holster, and a notepad—as well as by Case's failure to respond to their urgent knocking. If Case had already shot himself, he could have been severely injured and in need of immediate medical care. And if he had not, the risk of suicide remained acute, given all the facts then known to the officers. It was thus objectively reasonable for the police to believe that Case needed emergency aid.

Case counters that only the police entry itself created a "likely danger." Brief for Case 45. His argument turns on the prospect of suicide-by-cop. As noted earlier, Case had once before acted in a way seemingly designed to provoke a lethal police response, as the officers knew. See *supra*, at 2. And J. H. told the officers that Case had threatened to

"shoot them all too" if they came to the scene. *Ibid.* So the "main risk the officers objectively faced," Case posits, was that "their very entry would induce" a shoot-out, leading to a "suicide-by-cop." Brief for Case 18. And indeed, Case contends, the officers knew that: Why else would they have "waited roughly 40 minutes after their arrival" before entering his home? *Id.*, at 43. Case concludes that if the officers had only left well enough alone, nothing would have happened.

But Case much oversimplifies a complex situation. The objective reasonableness of an officer's conduct under *Brigham City*, as in other Fourth Amendment contexts, is evaluated by looking at the "totality of the circumstances." *E.g.*, *Barnes* v. *Felix*, 605 U. S. 73, 80 (2025); *Ohio* v. *Robinette*, 519 U. S. 33, 39 (1996). One of those circumstances was no doubt that Case could provoke a confrontation. As noted earlier, that was partly why the officers called the police chief to the scene and why they carefully considered protective measures—leading to some delay in their entry. See *supra*, at 2. But there is no basis for thinking that the officers would have gone into Case's home just so he could instigate a gunfight. The circumstances making their entry reasonable, as just stated, were those suggesting that Case may already have shot himself or would do so absent intervention. The statements Case made to J. H. plus the visual evidence corroborating them indicated that Case wanted to end his life. The decision of the officers to enter his home to prevent that result—even at some significant risk to themselves—was (at the least) reasonable. The Fourth Amendment did not require them, as Case now argues, to leave him to his fate.

*       *       *

We repeat today what we have held before: An officer may enter a home without a warrant if he has "an objectively reasonable basis for believing that an occupant is seriously

injured or imminently threatened with such injury." *Brigham City*, 547 U. S., at 400. The officers' entry satisfied that test. Accordingly, we affirm the judgment (even though not all the reasoning) of the Montana Supreme Court.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 24–624

WILLIAM TREVOR CASE, PETITIONER *v.* MONTANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MONTANA

[January 14, 2026]

JUSTICE SOTOMAYOR, concurring.

I join the Court's opinion, which holds that police officers may enter a home without a warrant if they have an "'objectively reasonable basis for believing'" that an occupant is seriously injured or imminently threatened with such harm. *Ante*, at 5, 7, 10. Although the Montana Supreme Court's opinion appeared, erroneously, to apply a lower standard akin to reasonable suspicion, I agree that the officers here had an "'objectively reasonable basis for believing'" that Case needed emergency assistance because he may have already shot himself or was imminently going to do so. *Ante*, at 7–10.

I write separately to underscore the unique considerations that law enforcement and courts should bear in mind when assessing whether there is an "objectively reasonable basis to believe" that a person experiencing a mental-health crisis needs law enforcement to "render emergency assistance." *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). As *Brigham City* explained, the "'justification for what would be otherwise'" an illegal warrantless entry of a home in this context is "'[t]he need to protect or preserve life or avoid serious injury.'" *Ibid*. (quoting *Mincey* v. *Arizona*, 437 U. S. 385, 392 (1978)). The officers in *Brigham City*, for instance, needed to enter the house to break up an ongoing fight to protect a person whom they saw through a window being struck in the face and to prevent further violence. 547

U. S., at 406.  When an officer is called to respond to a person at risk of suicide, however, entering the house may not always be the objectively reasonable course of action to "'preserve life or avoid serious injury.'"  *Id.*, at 403 (quoting *Mincey*, 437 U. S., at 392).

   In these kinds of circumstances, the presence of law enforcement at times can escalate the situation rather that ameliorate it, putting both the occupant and the officers in danger.  See, *e.g.*, *Chamberlain* v. *White Plains*, 960 F. 3d 100, 101–104, 108 (CA2 2020) (officers repeatedly attempted entry of the home of a person with a known "history of mental illness," eventually shooting and killing the occupant after he repeatedly said he was "'okay'" and officers saw he did not need medical attention); *Bailey* v. *Kennedy*, 349 F. 3d 731, 734–736, 744 (CA4 2003) (officers attempted to enter house based on a neighbor's report of suicide, eventually kicking and striking occupant to arrest him, despite occupant telling the officers that he was not suicidal and that they should leave).  The risk of escalation is also heightened by the prevalence of firearms in nearly half of American households.[1]  Police may employ more forceful tactics when they know a firearm is in the house, and an occupant who is experiencing an acute mental-health crisis may react more unpredictably in response.  See, *e.g.*, *Corrigan* v. *District of Columbia*, 841 F. 3d 1022, 1025–1028 (CADC 2016) (despite occupant voluntarily meeting the police outside and disclaiming any intention to harm himself, the officers triggered occupant's post-traumatic stress disorder after kicking his door and searching his house, based on report that he was suicidal and owned firearms); *Frazier* v. *Miller*, 404 Mont. 1, 484 P. 3d 912, 916 (2021) (occupant initially told police he was "'fine'" and to "go away" but drew pistol to his own head when the

——————
   [1] In 2025, 42% of Americans reported living in a gun-owning household. Gallup, Guns, https://news.gallup.com/poll/1645/guns.aspx.

officer continued to attempt entry, leading the officer to draw his gun in response and eventually shoot the occupant).

Studies show that individuals with serious mental-health conditions are disproportionately likely to be injured and seven times more likely to be killed during police interactions compared to the general population.[2]  One report showed that over a 2-year period, "calls for help resulted in law enforcement officers shooting and killing the very people they were called on to assist" in 178 cases.[3]  Another study found that police shooting incidents involving behavioral health concerns (suicidal behavior, substance use, or serious mental illness) were 2.1 times more likely to result in fatal injury than other police shooting incidents.[4]  Further, individuals with a mental illness were "2.8 times more likely" to "be killed in their own homes" compared to those without a mental illness.[5]

Given these risks, in some circumstances it may be more reasonable for officers to try different means of de-escalation before entering the home of a person experiencing a mental-health crisis.  Officers could, for example, attempt to speak with the occupant from a distance or over the phone; contact family, friends, or neighbors to help intervene; call in specialized police units, such as negotiators or

---

[2] See H. Jun, J. DeVylder, & L. Fedina, Police Violence Among Adults Diagnosed With Mental Disorders, 45 Health & Soc. Work 81 (May 2020); A. Saleh, P. Applebaum, X. Liu, T. Stroup, & M. Wall, Deaths of People with Mental Illness During Interactions With Law Enforcement, 58 Int'l J. L. & Psychiatry 110, 114 (May-June 2018) (Saleh).

[3] J. Gerberg & A. Li, When a Call to the Police for Help Turns Deadly, Washington Post, June 22, 2022, https://www.washingtonpost.com/investigations/interactive/2022/police-shootings-mental-health-calls/.

[4] J. Ward et al., National Burden of Injury and Deaths From Shootings by Police in the United States, 2015–2020, 4 Am. J. Pub. Health 387, 391–392 (2024).

[5] Saleh 114.

officers trained in crisis intervention;[6] or otherwise work with mental-health professionals to approach the occupant.[7] Officers called to respond to these kinds of situations should carefully investigate and assess the nature of the potential crisis and determine whether there is an objectively reasonable basis to believe that the occupant needs emergency aid inside before entering without a warrant. Once the decision is made to enter, moreover, the "manner" of the officers' entry and their subsequent conduct inside must also be "reasonable." *Brigham City*, 547 U. S., at 406.

This case highlights the very complexities that will often attend emergency-aid interventions involving reported mental-health crises. Multiple facts suggested that Case did not need emergency aid but was instead waiting inside for the officers in order to provoke a confrontation that would result in "suicide-by-cop."

Case had told his girlfriend, J. H., on the phone that he would "shoot them all" if she called the police to his house. App. 69. Once J. H. arrived at the house, she told the officers that Case threatened to "shoot it out" with the police. *Id.*, at 70–74. The officers also knew that in a prior incident in which police were called to respond to a suicide attempt by Case, Case had confronted the police in a way that suggested he was attempting suicide-by-cop. Then, while surveying the house, the officers discussed how Case had "'tried suicide by cop before'" and that it was likely Case

––––––––

[6] See *id.*, at 114–115; Brief for American Psychiatric Association et al. as *Amici Curiae* 18–25 (describing programs that involve sending teams of specially trained police to respond to calls about mental-health crises).

[7] Many jurisdictions around the country have introduced programs in which police officers and mental-health professionals jointly respond to calls about mental-health crises. See Policy Research, Inc. & National League of Cities, A. Krider, R. Huerter, K. Gaherty, & A. Moore, Responding to Individuals in Behavioral Health Crisis Via Co-responder Models (Jan. 2020), https://www.theiacp.org/sites/default/files/SJC Responding%20to%20Individuals.pdf (describing "co-responder" programs).

was "'going to pull a gun on us'" once they "'go in the house.'"  417 Mont. 354, 373, 553 P. 3d 985, 998 (2024).

These facts, taken together, suggested that Case was neither already injured nor about to injure himself, but rather that the primary danger he faced would arise only if the officers entered his house.  In other words, these facts tended to undermine the officers' basis to believe that he needed emergency assistance inside.

The officers' warrantless entry ultimately did not violate the Fourth Amendment, however, because there were sufficient facts on the other side of the ledger supporting an objectively reasonable basis to believe that Case had shot himself.  Critically, Case had told J. H. he had a "loaded gun" and J. H. heard a "clicking" sound like the "cock[ing]" of "a gun," a "pop," and then "just dead air" despite J. H. yelling Case's name multiple times over the phone.  App. 68–69; 417 Mont., at 357, 553 P. 3d, at 988.  Case also told J. H. that he was "going to get a note" and "kill himself."  App. 67–68.  When the officers arrived, they saw an empty handgun holster and notepad with writing inside Case's house, and Case did not respond when they shouted his name into an open window.  Considered together, those facts gave rise to an objectively reasonable basis for the officers to believe that Case was already injured and in need of emergency medical assistance, and was not necessarily waiting inside for the officers seeking to provoke an escalation leading to suicide-by-cop.  As a result, the officers did not violate the Fourth Amendment when they entered Case's home.[8]

That conclusion, on the facts of this case, does not mean it will always be objectively reasonable for officers responding to a mental-health crisis to make a warrantless entry.

---

[8] Case has not challenged the reasonableness of the officers' manner of entry or their conduct inside his house after entry.  As a result, neither the decision below nor this Court had occasion to consider the reasonableness of that conduct.

A different mix of information might have led to the conclusion that the officers' entry itself would put the occupant (and officers) at a greater risk of escalation and serious injury.  Because the "objectively reasonable basis" test, as reaffirmed by the Court today, demands careful attention to the case-specific risks that attend mental-health crises, and requires officers to act reasonably in response, I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–624

_____

## WILLIAM TREVOR CASE, PETITIONER *v.* MONTANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MONTANA

[January 14, 2026]

JUSTICE GORSUCH, concurring.

Today's case, like another before it, holds that police officers generally do not violate a person's Fourth Amendment rights when they enter his house without a warrant, but with an "'objectively reasonable basis'" for believing someone inside is in physical danger and in need of immediate aid. *Ante,* at 7 (quoting *Brigham City* v. *Stuart*, 547 U. S. 398, 400 (2006)). Importantly, the Court observes, this exception to the warrant requirement permits entry only to the extent reasonably necessary to address the apparent emergency and does not authorize officers to search a home more broadly. See *ante,* at 9. With all that, I agree.

But to me, a question lingers: Why? Does the Fourth Amendment tolerate this limited emergency aid exception to the warrant requirement just because five or more Justices of this Court happen to believe that such entries are "reasonable"? Or is this exception more directly "tied to the law"? *Carpenter* v. *United States*, 585 U. S. 296, 397 (2018) (GORSUCH, J., dissenting). The answer, I believe, is the latter.

From before the founding through the present day, the common law has generally permitted a private citizen to enter another's house and property in order to avert serious physical harm. In those circumstances, and many others, courts have historically held that property rights give way to concern for human safety. See, *e.g.*, 37 Hen. 6, pl. 26;

*Mouse's Case*, 12 Co. Rep. 63, 77 Eng. Rep. 1341 (K. B. 1608); *Republica* v. *Sparhawk*, 1 Dall. 357, 363 (Pa. 1788); *Ploof* v. *Putnam*, 81 Vt. 471, 474–475, 71 A. 188, 189 (1908). Courts have long described property-law necessity defenses like these as turning, too, on the adequacy of the defendant's judgment, not a *post-hoc* assessment of necessity in fact. See, *e.g.*, *Mitchell* v. *Harmony*, 13 How. 115, 134–135 (1852); *Stone* v. *Mayor of City of New York*, 25 Wend. 157, 176 (N. Y. 1840) (opinion of Verplanck, Sen.); *Surocco* v. *Geary*, 3 Cal. 69, 72 (1853).*

The common-law emergency rule is now often summarized this way: "One is privileged to enter or remain on land in the possession of another if it is or reasonably appears to be necessary to prevent serious harm to . . . the actor[,] . . . the other[,] or a third person . . . unless the actor knows or has reason to know that the one for whose benefit he enters is unwilling that he shall take such action." Restatement (Second) of Torts §197(1) (1963–1964). But, of course, this privilege comes with its logical limitations. So, for example, a private citizen who enters a home to render emergency aid lacks license to do so in a manner "which a reasonable man would not regard as necessary to" address the apparent emergency. *Id.*, §214, and Comment *a*; see also *id.*, §197, Comment *a*; *Des Moines* v. *Webster*, 861 N. W. 2d 878, 883–885 (Iowa App. 2014); *State* v. *Lukus*, 149 Mont. 45, 50–51, 423 P. 2d 49, 52–53 (1967).

---

*Contrary to Mr. Case's argument, *King* v. *Coate*, Lofft. 73, 98 Eng. Rep. 539 (K. B. 1772), does not establish that the common law demanded an exacting showing of actual necessity to defeat a claim for trespass. True, Lord Mansfield explained that any necessity defense in that case would need to "stand the strictest test," with the "necessity manifestly proved." *Id.*, at 75, 98 Eng. Rep., at 540. But *Coate* involved an effort to involuntarily "confin[e] a person in a madhouse" for two months, not a claim over a home entry. *Id.*, at 74, 98 Eng. Rep., at 539. And it is hardly surprising that the common law would demand a good deal more to justify a serious deprivation of liberty than to excuse an invasion of property rights aimed at protecting human safety.

Today's decision echoes both the common-law emergency aid rule and its limitations. It does so, to be sure, in the context of a law enforcement officer, not a private citizen, who sought to enter another's home. But on this point as well the common law has spoken, long providing that officers generally enjoy the same legal privileges as private citizens. See, *e.g.*, *Entick* v. *Carrington*, 19 How. St. Tr. 1029, 1066 (C. P. 1765); 1 J. Chitty, Criminal Law 36 (1819); 2 M. Hale, Historia Placitorum Coronae 91 (1736). And, reflecting the common law here again, this Court has held that the Fourth Amendment usually permits officers lacking a valid warrant to "take actions that any private citizen might do without fear of liability." *Caniglia* v. *Strom*, 593 U. S. 194, 198 (2021) (internal quotation marks omitted). But they normally may do "no more" than that. *Kentucky* v. *King*, 563 U. S. 452, 469 (2011); see also *Entick*, 19 How. St. Tr., at 1066.

It should come as no surprise that our decision today might accord with the accumulated learning of the common law—just as it should come as no surprise that our application of the Fourth Amendment ought to be informed by the common law's lessons rather than mere intuition. For a period, to be sure, the miasma created by this Court's *Katz* era led some to think the scope of the rights guaranteed by the Fourth Amendment depend on nothing more than current judicial instincts about "reasonable expectations of privacy." See *Carpenter*, 585 U. S., at 394–395, 405–406 (GORSUCH, J., dissenting). But that confusion cannot last forever, for no one should think the rights of Americans hang on so thin a thread. Instead, and as Justice Story recognized, the Fourth Amendment is made of sturdier stuff, representing "the affirmance of a great constitutional doctrine of the common law." 3 Commentaries on the Constitution of the United States 748 (1833).